RUTH CREIGHTON, Indiv. and as Special Adm'r of the Estate of Robert Creighton, Deceased, Plaintiff-Appellant, v. DELORES THOMPSON, Special Adm'r of the Estate of Charles E. Thompson, Deceased, *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—92—1921

Opinion filed August 23, 1994.

Leonard M. Ring & Associates, P.C., of Chicago (Leonard M. Ring, Barry R. Chafetz, and Harry C. Lee, of counsel), for appellant.

Connelly, Mustes & Schroeder, of Chicago (John J. Mustes, Kathleen A. Bridgman, and Anthony J. Bruozas, of counsel), for appellee Delores Thompson.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Paul B. O'Flaherty, Jr., Michael A. Pollard, and Michael T. Pfau, of counsel), for other appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Ruth Creighton, appeals from the judgment entered on a jury verdict for defendants in a medical malpractice action and from the denial of her post-trial motion. She questions whether the circuit court committed reversible error in (1) permitting cross-examination of her expert witness concerning restrictions on his medical license; (2) failing to strike the opinion testimony of a defense expert; (3) allowing a second defense expert to testify using a statistical probability; and (4) failing to strike the testimony of a third defense expert after he evaded questions about his financial interest. We affirm.

Decedent's Medical History. On May 24, 1982, plaintiff's decedent, Robert Creighton, visited Dr. Sol Barnett, not a party in this case, and underwent a routine Federal Aviation Administration (FAA) physical to maintain his private pilot's license. During the examination, Dr. Barnett palpated Creighton's abdomen and discovered a vague abnormality in the midline area. He described the finding in his records as a "vague fullness in the midline which may be nothing." Nevertheless, he advised Creighton to follow up with tests to evaluate the fullness. Creighton told Dr. Barnett that he would be receiving a complete, company physical in a couple of weeks and that the necessary tests could be run then. As a result, Dr. Barnett did not insist that any tests be performed at that time. Dr. Barnett made no note of the finding in his FAA report because he was uncertain whether it signified a problem and did not want to jeopardize Creighton's pilot's license; if he had found an abnormality of significance, he would have reported it to the FAA.

One month later, on June 23, 1982, Creighton visited defendant Dr. Charles Thompson for an executive company physical as required by his employer, Solo Cup Company. Dr. Thompson was performing this physical either as part of his private practice or on assignment from defendant Life Extension Institute Medical Group (Life Group). Creighton informed Dr. Thompson of Dr. Barnett's previous finding.

Dr. Thompson felt his abdomen and found no abnormality. He asked Creighton if he had been struck in the stomach recently, and when Creighton answered negatively, he suggested the problem may have been related to the location of Creighton's belt buckle.

To the contrary, Dr. Thompson testified that Creighton did not report any abdominal complaint, nor did he inform him of Dr. Barnett's previous finding of abnormality. When Dr. Thompson inquired whether Creighton had any health problems, he responded only that he suffered from migraine headaches, hoarseness, and a tendency to gain weight. Dr. Thompson could not recall the specifics of Creighton's examination, but he routinely palpated a patient's abdomen during a physical. His records indicated no abnormality.

On July 22, 1982, Creighton was seen by Dr. Harlan Failor at a clinic in Urbana, Illinois, due to complaints of nausea, vomiting, and diarrhea following a trip to Panama. Dr. Failor examined Creighton's abdomen and noted that it was soft, with no bowel sounds, meaning there was no obstruction therein. He found no abnormalities with Creighton's abdomen. Specifically, he detected no mass, no tumor, and no fullness.

Creighton visited Dr. Barnett a second time on August 5, 1983, and specifically complained of a sore throat. Dr. Barnett did not examine Creighton's abdomen, nor did he follow up concerning his May 1982 finding of vague abdominal fullness.

Creighton underwent another executive company physical at Life Group on September 16, 1983, where he was examined by its medical director, defendant Dr. C. Fletcher Watson. Dr. Watson used a questionnaire to obtain a detailed medical history of Creighton. Creighton expressed no complaints relating to his abdomen and did not report Dr. Barnett's finding of a vague fullness.

The physical examination performed by Dr. Watson was the standard physical performed for company examinations. This included both superficial and deep palpation of the abdomen. Dr. Watson's records indicated that he examined Creighton's abdomen and found it to be normal. Dr. Watson performed close to 10,000 abdominal examinations in 1983, including occasions where he detected a mass or other positive finding.

On May 9, 1984, Creighton again visited Dr. Barnett for a FAA physical. While palpating Creighton's abdomen, Dr. Barnett noted an abnormality in the same area where he had previously felt the vague fullness. He described it as a pulsating mass in the midline between the umbilicus and epigastric area. The abnormality was more prominent in 1984 than in 1982. Dr. Barnett asked Creighton whether he had followed up on the previous finding in 1982, and Creighton explained that he had forgotten to do so.

Tests, including X rays and a surgical opinion, were ordered to determine the nature of the abnormality. Creighton went to Northwestern Memorial Hospital in June 1984, where it was determined that he had a mass in the retroperitoneum surrounding the aorta. The retroperitoneum is the area of the body behind the abdominal organs, such as the liver, kidneys, and bowels. The mass was diagnosed as malignant lymphoma mixed diffuse with sclerosis. The lymphoma was designated a stage IV because it was wrapped around the aorta and had spread to the bone marrow. In most cancers, including lymphoma, there are four stages. Stage I is a very localized lymphoma with only one lymph node affected. Stage II lymphoma involves two lymph nodes on one side of the diaphragm. Stage III lymphoma involves cancer located in the lymph nodes and present on both sides of the diaphragm. Stage IV lymphoma signifies that the cancer has spread beyond the lymph nodes to an organ or the bone marrow.

Creighton visited the Memorial Sloan-Kettering Cancer Center in New York to obtain a second opinion from Dr. Burton Lee, a medical oncologist. There, he was diagnosed as having a diffuse, poorly differentiated, lymphocytic lymphoma, which was considered stage IV due to the location and bone marrow involvement. This particular disease has a poor prognosis with a high likelihood of recurrence. Dr. Lee informed Creighton that he may do well with treatment, but there was no guarantee of a cure. Creighton was treated with chemotherapy and radiation therapy and achieved complete clinical remission of the disease by January 1985.

In February 1986, Creighton began suffering pains in the abdomen. Dr. John Schmale, one of Creighton's treating physicians, ordered tests which indicated that the tumor had reoccurred in exactly the same spot. Dr. Lee advised Creighton there was no cure and the best they could do is keep him in remission for as long as possible. Creighton died on November 4, 1986.

While treating Creighton's cancer, Dr. Schmale examined Creighton's abdomen on August 16, 1984, but failed to detect a fullness, although a small abdominal mass was present at the time, and despite the fact he was looking for it specifically. Again in March 1986, Dr. Schmale was unable to detect any mass when palpating the abdomen, although he knew it was there.

Rulings *In Limine*. Plaintiff presented a single expert witness, Dr. Elliot Oppenheim, to testify that Drs. Thompson and Watson deviated from acceptable standards of medical care in their respective physical examinations of Creighton. The circuit court entertained defense motions to bar Dr. Oppenheim from testifying. The motions

asserted several grounds for his disqualification, including: (1) his failure to possess an unrestricted license to practice medicine at the time of trial, due to the conditional suspension of his license by the Medical Disciplinary Board of the State of Washington; (2) a prior history of professional discipline including license revocation, deriving from his conviction on felony narcotics charges; (3) demonstrated confusion on the medical issues in the case, including analysis of Creighton's non-Hodgkin's lymphoma as Hodgkin's disease in deposition testimony; and (4) willful evasion of discovery concerning his income from litigation consulting. Plaintiff presented a cross-motion *in limine* to exclude mention of Dr. Oppenheim's license restrictions during trial, asserting it was too prejudicial.

The Washington State Medical Disciplinary Board had revoked Dr. Oppenheim's license in 1980 in connection with his conviction on felony narcotics charges. He remained on probationary status until April 17, 1987. On May 14, 1991, he was charged with inappropriately treating two patients leading to the hospitalization of one and the death of the other.

To resolve these charges, Dr. Oppenheim agreed with the Washington State Medical Disciplinary Board to several restrictions on his medical license, which were still in effect at the time of trial. These restrictions included that: (1) his practice would be monitored through announced and unannounced visits; (2) his practice would be monitored by a physician-proctor; (3) he would undergo personal psychotherapy to address his personal problems; (4) he would refrain from discussing his personal affairs with patients; (5) he would not engage in any mental health counselling or psychotherapy; and (6) he would not examine female patients without a female staff member being present.

The circuit court denied defendants' motions to disqualify Dr. Oppenheim from testifying as an expert. It ruled, however, that defendants may cross-examine Dr. Oppenheim concerning certain license restrictions: that his license was subject to announced and unannounced inspections by the licensing agency, and that his patient records were to be reviewed periodically by a physician-proctor. No reference could be made concerning Dr. Oppenheim's criminal convictions, which were more than 10 years old, or of any disciplinary action taken against him.

Trial Testimony Concerning Proximate Cause. Plaintiff's other expert, Dr. James Bryant, testified that he is a pathologist whose entire practice involves cancer. He works in a laboratory diagnosing tissue samples and does not treat patients directly. In Dr. Bryant's opinion, the abnormality detected by Dr. Barnett in 1982 was the

same cancer later identified in 1984. He believed that in 1982 and 1983, when Drs. Thompson and Watson examined Creighton, his cancer was only at stage I or stage II. This belief was based on Creighton's then-normal hemoglobin counts and a normal diagnosis of his axillary lymph nodes in 1983. Therefore, Dr. Bryant concluded, if Creighton's cancer had been diagnosed and treated by Dr. Thompson in 1982 and Dr. Watson in 1983, it was more likely than not that Creighton would have been cured.

In contrast, defendants' expert Dr. Harvey Golomb, an internist and practicing oncologist, as well as a full professor at the University of Chicago, testified that in his clinical experience, consisting of more than 500 lymphoma patients over 15 years, 70% to 80% of patients suffering from small cell lymphoma such as Creighton's are stage IV when diagnosed, and that the most frequent place for stage IV lymphoma is the bone marrow. Therefore, he concluded that Creighton's cancer probably was stage IV in 1982 and 1983. This opinion was based upon the evidence that Creighton had something in his abdomen in 1982, which was a precursor to the tumor, and that a single lymph node could not be felt; thus, the mass must have been at least a conglomeration of several lymph nodes in 1982 and 1983.

Dr. Schmale, one of Creighton's treating physicians, testified that he could not determine how long Creighton had had stage IV lymphoma with bone marrow involvement; that there was no real way to determine when his lymphoma started; and that his lymphoma did not necessarily progress through each stage. Dr. John Merrill, another of Creighton's treating physicians, testified that no one could date the onset of Creighton's lymphoma, and he could not say to a reasonable degree of medical certainty that Creighton's lymphoma would have been cured if diagnosed in 1982 or 1983.

Trial Testimony Concerning the Standard of Care. Dr. Oppenheim, a family practitioner, testified that both Drs. Thompson and Watson failed to exercise the appropriate medical standard of care in performing their respective physical examinations of Creighton in 1982 and 1983.

With respect to Dr. Thompson, Dr. Oppenheim based his opinion on the following: his records did not show that a complete physical had been performed as they contained no reference to an abdominal examination; his records contained a notation regarding Dr. Barnett but no apparent follow up; and he failed to detect any abnormality even though Dr. Barnett had done so only a month earlier. Dr. Oppenheim stated that it should have been easier for Dr. Thompson to detect the same abnormality because Creighton's weight had decreased from 185 pounds to 172 pounds between those visits.

According to Dr. Oppenheim, it was irrelevant whether Creighton told Dr. Thompson about Dr. Barnett's earlier finding because Dr. Thompson should have palpated the same abnormality.

Regarding Dr. Watson, Dr. Oppenheim based his opinion on the following: he failed to obtain an adequate history because the questionnaire format he used was essentially meaningless; he failed to perform an adequate physical; and he failed to detect the abnormality previously found by Dr. Barnett, even though it should have been larger at that time.

Defendants presented several expert witnesses in rebuttal. Dr. John Sabbia, an internist, testified that in his opinion Dr. Thompson complied with the medical standard of care because of the following: Dr. Thompson's records suggest his examination included a palpation of Creighton's abdomen (Creighton's own testimony confirmed this); Dr. Thompson's failure to detect the vague fullness was not a deviation; Dr. Thompson did not deviate in follow-up care, since routine practice dictates that an examining doctor write down the name of the patient's last physician; and, assuming that Creighton had told Dr. Thompson about the prior finding of a vague fullness, he did not vary from the standard of care because such a finding is nondescript and could mean different things to different physicians.

Dr. Patrick Sullivan, also an internist, testified that Dr. Watson complied with the prevailing medical standards in his 1983 examination of Creighton. He found Dr. Watson's history and examination to be complete and thorough. He also testified that the 1982 finding of a vague fullness did not necessarily signify the presence of a tumor.

Dr. Golomb testified that both Drs. Thompson and Watson complied with the applicable standard of care when examining Creighton. He said that despite Dr. Barnett's findings of a vague fullness it would not be unusual for another examiner to fail to appreciate the fullness, especially if the patient failed to inform the doctor of it. Dr. Golomb further stated that because of the location of the mass, which was the retroperitoneal area deep in the abdomen, a mass frequently would not be appreciated until it had grown to a significant size and bulk.

Following trial, the jury returned a verdict in favor of all defendants and against plaintiff. Plaintiff appeals.

## I

Plaintiff initially contends that the circuit court committed reversible error when it allowed defendants to cross-examine Dr. Oppenheim concerning the restrictions on his medical license. According to plaintiff, those license restrictions were extremely prejudicial and

"had only attenuated relevance" to his professional opinion. This is an issue of first impression in Illinois.

■ The latitude afforded in cross-examination is within the discretion of the circuit court, reversible only for a clear abuse of discretion resulting in manifest prejudice to a party. (*People v. Torres* (1990), 200 Ill. App. 3d 253, 265, 558 N.E.2d 645.) The principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship, or financial interest. (*Trower v. Jones* (1988), 121 Ill. 2d 211, 217, 520 N.E.2d 297.) It is of ever-increasing importance to bring to the jury's attention facts by which the jury may reasonably discount the credibility of an expert's testimony. *Trower*, 121 Ill. 2d at 217.

*Richmond v. Longo* (1992), 27 Conn. App. 30, 604 A.2d 374, involved a similar issue. There, defendants were prohibited from cross-examining plaintiff's expert witness about restrictions on his medical license and the termination of his surgical privileges. (*Richmond*, 27 Conn. App. at 39, 604 A.2d at 378.) The reviewing court found this prohibition to be an abuse of discretion and reversed for a new trial, holding that such questions concern credibility and should go to the weight, and not the admissibility, of the expert's testimony. *Richmond*, 27 Conn. App. at 39, 604 A.2d at 378.

■ Here, the circuit court carefully crafted its ruling so that the jury would be informed of only two of the current restrictions on Dr. Oppenheim's medical license—that the licensing agency could conduct announced and unannounced inspections of his practice, and that a physician-proctor was to review periodically his patient records—but not of his criminal convictions or of his history of disciplinary action. Plaintiff's assertion that this ruling was error must be rejected. In the only State where Dr. Oppenheim was licensed, he was unable to practice medicine without supervision. This information was highly relevant to his credibility because his testimony concerned only whether other physicians failed to exercise the appropriate standard of medical care during the precise time frame in which his home licensing authority required that his professional practices be audited. Under these circumstances, any prejudice resultant to plaintiff's case was well warranted. See generally Annot., 11 A.L.R.5th 1, §§ 10, 11, at 32-34 (1993).

Plaintiff nevertheless asserts that *O'Brien v. Meyer* (1989), 196 Ill. App. 3d 457, 554 N.E.2d 257, controls this case. There, the appellate court ruled that a medical expert could not be cross-examined about a previous failure to pass the Illinois licensing examination, since that information's prejudicial impact outweighed its scant probative

value. (*O'Brien*, 196 Ill. App. 3d at 464-65.) This case is factually distinguishable from *O'Brien*. Here, after having secured his license, Dr. Oppenheim's professional conduct was called into question and was thought to warrant continuing surveillance.

Plaintiff also cites *Poole v. University of Chicago* (1989), 186 Ill. App. 3d 554, 542 N.E.2d 746, where reversal resulted when the jury was informed of disciplinary proceedings pending against an expert. No charges were pending here; Dr. Oppenheim's practices were already found sufficiently wanting so as to require professional oversight. Also, unlike the jury in *Poole*, the jury here never was informed of any disciplinary action taken against Dr. Oppenheim. *Poole* is therefore inapposite.

In conclusion, the circuit court properly allowed limited cross-examination of Dr. Oppenheim concerning some of the current restrictions on his medical license.

## II

■ Plaintiff argues next that the circuit court committed reversible error in failing to strike Dr. Sabbia's opinion testimony after he claimed to have based his opinion on depositions unavailable to him at the time. Dr. Sabbia testified that he based his opinion in part on the depositions of Creighton and Dr. Thompson, and that he arrived at his opinion on March 31, 1986—a month before Creighton was deposed and nine months before Dr. Thompson was deposed. Dr. Sabbia was therefore impeached at trial. The circuit court denied plaintiff's motion to strike Dr. Sabbia's testimony, noting that counsel could argue the impeachment to the jury at the appropriate time, which plaintiff's counsel did.

A judgment will not be disturbed where it appears from the record that the asserted error did not affect the outcome of the case. (*Both v. Nelson* (1964), 31 Ill. 2d 511, 514, 202 N.E.2d 494.) A review of the record discloses that plaintiff's case was quite weak as compared to defendants'; Dr. Sabbia's testimony was largely cumulative to that of Dr. Golomb, a highly qualified and credible defense expert; and, most importantly, Dr. Sabbia was indeed impeached before the jury, a factor which it undoubtedly considered before rendering its verdict. Assuming, *arguendo*, that error occurred here, it could not have affected the outcome of this case. Therefore, the jury's verdict cannot be disturbed.

## III

■ Plaintiff maintains that the circuit court committed reversible error in allowing Dr. Golomb to testify using a statistical probability.

The challenged testimony is that, in 1982 and 1983, there was a 70% to 80% chance that Creighton's cancer was already a stage IV lymphoma. Plaintiff claims this testimony was wholly speculative because there was no evidence of bone marrow involvement at that time.

Expert testimony in terms of probabilities is proper (M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.4, at 569 (6th ed. 1994)) if the expert can relate the statistic to plaintiff's specific medical condition. *Boatmen's National Bank v. Martin* (1992), 223 Ill. App. 3d 740, 745, 585 N.E.2d 1328, *aff'd* (1993), 155 Ill. 2d 305, 614 N.E.2d 1194.

Here, Dr. Golomb's testimony specifically related to Creighton's condition. Dr. Golomb was a trained oncologist who, in his 15 years of experience, had himself observed a 70% to 80% correlation between the diagnosis of that type of lymphoma and bone marrow involvement. His statistical data was in fact confirmed at trial by another treating oncologist, Dr. Lee. Dr. Golomb's testimony concerning the correlation was not mere speculation, as plaintiff contends, but rather was his professional opinion to a high degree of medical certainty based on his knowledge and past experience. Consequently, plaintiff's assertion fails.

## IV

Plaintiff lastly contends that the circuit court committed reversible error in failing to strike the testimony of a third defense expert, Dr. Sullivan, after he "evaded all questions" about his financial interest in the case.

Questions concerning a medical expert's financial interest are proper as impeachment. (*Trower v. Jones* (1988), 121 Ill. 2d 211, 218, 520 N.E.2d 297.) Where an expert attempts to conceal his or her financial interest by continually evading questions, reversal for a new trial may be proper. (*Washington v. Yen* (1991), 215 Ill. App. 3d 797, 799-800, 576 N.E.2d 61.) A judgment will not be disturbed, however, where it appears from the record that the complained-of error did not affect the outcome of the case. *Both*, 31 Ill. 2d at 514.

Dr. Sullivan's answers to questions concerning his financial interest in this particular case were responsive. He testified that he charged from $225 to $350 per hour and had worked at least 10 to 12 hours. The fact remains, however, that Dr. Sullivan improperly evaded questions concerning his annual income from serving in other cases as an expert witness. (See *Trower*, 121 Ill. 2d at 122.) Nevertheless, the jury here would have returned the same verdict had Dr. Sullivan answered the questions. His testimony was similar to Dr. Golomb's testimony. Moreover, as defendants correctly observe,

72

plaintiff's expert Dr. Oppenheim evaded similar questions concerning his annual income from serving as an expert witness. Plaintiff cannot now cry foul when she engaged in the exact same conduct.

For the reasons expressed in this opinion, the judgment entered on the jury verdict in favor of defendants is affirmed, as is the denial of plaintiff's post-trial motion.

Affirmed.

DiVITO, P.J., and McCORMICK, J., concur.