(No. 75730.—<span style="background:black">     </span>

JENNIFER SIMMONS, Adm'r of the Estate of Tous-
sant Devon Simmons, a Minor, Deceased, *et al.*,
Appellees, v. UNIVERSITY OF CHICAGO HOSPI-
TALS AND CLINICS, d/b/a University of Chicago
Medical Center, *et al.*, Appellants.

*Opinion filed September 22, 1994.*

Timothy J. Ashe and Lynn D. Dowd, of Cassiday, Schade & Gloor, and Barry Sullivan and Jeffrey T. Shaw, of Jenner & Block, all of Chicago, for appellants.

Edward R. Vrdolyak, Ltd., of Chicago (Timothy Quinn and Gino P. Naughton, of counsel), for appellees.

JUSTICE NICKELS delivered the opinion of the court:

Defendants, University of Chicago Hospitals and Clinics and Luis Cibils, M.D., appeal from an appellate court decision affirming a $1.6 million verdict for plaintiffs in a medical malpractice case, which involved the death of plaintiffs' son shortly after birth. We granted defendants' petition for leave to appeal (134 Ill. 2d R. 315) and affirm.

FACTS

Plaintiff Jennifer Simmons was admitted to defendant hospital on April 5, 1983, between approximately 10 and 10:30 a.m. At that time, Jennifer was in active labor. The hospital staff examined Jennifer and placed her on a fetal monitor. A decision was made to rupture Jennifer's membrane and attach a scalp electrode to the child. When Jennifer's membrane was ruptured around 11:40 a.m., she passed a thick meconium, indicative of fetal distress due to lack of oxygen.

A significant deceleration in fetal heart rate was observed at 12:20 p.m., at which time Dr. Luis Cibils,

the attending physician, was notified. Dr. Cibils ordered an emergency Caesarean section and Jennifer was brought to an operating room. At 12:28 p.m. the fetal heart rate recovered, and at 12:30 p.m., Dr. Cibils canceled the emergency Caesarean section. Jennifer was later brought back to the labor room.

A second deceleration occurred at 3:37 p.m., and Jennifer was brought back to the operating room where an emergency Caesarean section was performed at 3:57 p.m. The child had a heartbeat when delivered, but was in distress. The child's umbilical cord was wrapped around his arms, legs, and body. Attempts to resuscitate the child failed, and he later died of perinatal asphyxia.

Plaintiffs filed suit in the circuit court of Cook County for wrongful death under the Wrongful Death Act (Ill. Rev. Stat. 1981, ch. 70, par. 1 *et seq.*). The jury found for plaintiffs and awarded damages as follows: (1) $900,000 for Jennifer's loss of society, and (2) $700,000 for the father's loss of society. The appellate court affirmed. 247 Ill. App. 3d 177.

## ISSUES

Defendants raise two issues on appeal: (1) whether the appellate court erred in affirming the trial court's allowance of a missing-witness instruction and plaintiffs' counsel's corresponding argument (Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1989) (hereinafter IPI Civil 3d No. 5.01)); and (2) whether the appellate court erred in affirming the trial court's granting of plaintiffs' motion *in limine* barring evidence that plaintiffs had two children after the death of the instant child.

## I.

### A. The Missing-Witness Instruction

Defendants first argue that the trial and appellate courts erred in finding the jury properly received IPI

Civil 3d No. 5.01, the missing-witness instruction. To determine whether the courts erred, we must look to the factual basis given at trial for the instruction.

Defendants called Dr. Cibils to testify as both an expert and occurrence witness. On cross-examination, plaintiffs asked Dr. Cibils about a notation on Jennifer's chart, an interlineation written under Dr. Judith Hibbard's name, which read: "Late decelerations after epidural recovery noted." According to the chart, these late decelerations occurred at 3:25 p.m., after which time Dr. Cibils ordered Jennifer moved from the operating room back to the labor room. Dr. Cibils disagreed with the notation under Dr. Hibbard's name, that late decelerations had occurred at 3:25 p.m. However, assuming that such late decelerations had occurred at 3:25 p.m., Dr. Cibils admitted that it would have been against the standard of care to remove Jennifer from the operating room and transfer her back to the labor room at that time.

At the jury instruction conference, plaintiffs tendered IPI Civil 3d No. 5.01, which allows the jury, under certain circumstances, to infer that a witness, not produced by a party capable of producing the witness, would have testified adversely to that party. Plaintiffs argued that such an instruction was proper because defendants did not produce every doctor and staff member of the hospital present during Jennifer's labor and delivery. The trial court, however, found the instruction improper for any employee no longer employed by defendant hospital. Such an employee would not be under the control of the hospital. Only Dr. Hibbard remained employed by the defendant hospital.

Plaintiffs' counsel argued that the missing-witness instruction was warranted concerning Dr. Hibbard because she wrote the notation of late decelerations on Jennifer's chart. Plaintiffs' counsel further noted that Dr. Cibils acknowledged that if late decelerations had in

fact occurred as noted on the chart, the transfer of Jennifer from the operating room to the labor room would have deviated from the standard of care.

Defense counsel responded that the handwriting on the chart did not appear to be Dr. Hibbard's, though the notation was under Dr. Hibbard's signature. Defense counsel argued that, as such, an insufficient basis existed upon which to allow the missing-witness instruction.

The court responded that even if the notation was not Dr. Hibbard's, it had to be made by one of the defendant hospital's employees. Defense counsel then asked to reopen the case to call Dr. Hibbard to the stand and testify regarding the notation.

In response, plaintiffs' counsel asked to withdraw the instruction, noting that he would merely argue evidence of the missing witness to the jury. The trial court, finding the instruction too important to not know who wrote the notation, allowed defendants to reopen their case and call Dr. Hibbard to the stand. Plaintiffs' counsel withdrew the instruction, wanting the case to go to the jury that day.

The trial court thereafter informed plaintiffs' counsel that it was concerned about how far plaintiffs' counsel would go suggesting missing witnesses. The court instructed plaintiffs' counsel that he could "get as close to 501 [sic] as you can get without stepping over in your mind's eye."

Later, after recess, the trial court *sua sponte* reopened the discussion on the missing-witness instruction concerning Dr. Hibbard. The court noted that although the attorneys probably did not know that the notation on Jennifer's chart would have any impact on the case, Dr. Cibils had to know of the notation and its significance, and that it was contrary to his testimony. The court further noted that Dr. Cibils treated the notation as Dr. Hibbard's on the stand. The court concluded that

it was defendants' duty, not plaintiffs', to call Dr. Hibbard to explain the notation.

Defense counsel then stated that if the instruction was "being resubmitted" he would "want to consider" making a motion to reopen the case. The trial court again discussed the issue and concluded that the missing-witness instruction would be given. The trial court reasoned that Dr. Hibbard was present during the relevant period and that a notation existed on Jennifer's chart that, whether written by Dr. Hibbard or someone else, was written under Hibbard's name and contained statements adverse to defendants' position. The court based its decision to allow the instruction not on the notation alone, but also on the fact that Dr. Hibbard was present during the times relevant to the lawsuit. Defense counsel did not move to reopen the case and call Dr. Hibbard to testify.

The decision to instruct the jury as to the adverse inference of missing witnesses is within the sound discretion of the trial court. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 22.) Thus, absent an abuse of discretion, we will not reverse the trial court's decision. We find that the trial court did not abuse its discretion in giving the instruction.

The missing-witness instruction and its adverse inference are available when:

"the missing witness was under the control of the party to be charged and could have been produced by reasonable diligence, the witness was not equally available to the party requesting that the inference be made, a reasonably prudent person would have produced the witness if the party believed that the testimony would be favorable, and no reasonable excuse for the failure to produce the witness is shown." *Schaffner*, 129 Ill. 2d at 22.

Defendants argue specifically that the trial and appellate courts erred in finding: (i) Dr. Hibbard was not

equally available to plaintiffs; and (ii) a reasonable person would have produced Dr. Hibbard to testify.

### i. *Equal Availability*

Defendants argue that the trial and appellate courts erred in finding Dr. Hibbard not equally available to plaintiffs for four reasons: (1) Dr. Hibbard was physically available to plaintiffs, as they knew of her existence and address; (2) Supreme Court Rule 237 (compelled appearance of witness at trial) made her available to plaintiffs; (3) the doctor-patient relationship between Jennifer and Dr. Hibbard made her available to plaintiffs; and (4) if Dr. Hibbard was not considered equally available to plaintiffs, then virtually any of the defendant hospital's employees would have to be called to avoid the instruction.

Dr. Hibbard, as defendant's employee, and as being potentially liable to plaintiffs herself, was not equally available to plaintiffs. The comment to IPI Civil 3d No. 5.01 provides:

"A witness is not 'equally available' to a party if there is a likelihood that the witness would be biased against him, as for example *** an employee of the other party. *United States v. Beekman*, 155 F.2d 580, 584 (2d Cir. 1946); [citation]; *Kerns v. Lenox Mach. Co.*, 74 Ill. App. 3d 194, 392 N.E.2d 688, 30 Ill. Dec. 33 (3d Dist. 1979)." (IPI Civil 3d No. 5.01, Comment.)

Another treatise has noted on this matter:

"The failure of an employer to produce certain employees who have some knowledge of the matters at issue will justify such an inference." J. Lee & B. Lindahl, Modern Tort Law § 15.15, at 506, 509 (rev. ed. 1988), citing *Peterson v. General Rug & Carpet Cleaners* (1947), 333 Ill. App. 47.

While defendants argue that availability is limited to physical availability, we disagree. Another leading treatise has noted:

"It is often said that if a witness is 'equally available'

to both parties, no inference springs from the failure of either to call the witness. This can hardly be accurate, as the inference may be allowed when the witness could easily be called or subpoenaed by either party. What is in fact meant is that when so far as appears the witness would be as likely to be favorable to one party as the other, there will be no inference." (E. Cleary, McCormick on Evidence § 264, at 187 (4th ed. 1992).)

This treatise also notes that two types of situations exist where the missing-witness instruction may be given:

"In the first, an adverse inference may be drawn against a party for failure to produce a witness reasonably assumed to be favorably disposed to the party. In the second, the inference may be drawn against a party who has exclusive control over a material witness but fails to produce him or her, without regard to any possible favorable disposition of the witness toward the party. Cases in the second group are increasingly less frequent due to the growth of discovery and other disclosure requirements." E. Cleary, McCormick on Evidence § 264, at 185 (4th ed. 1992).

The situation here was that of the first example, and not the second. Thus, defendants' argument concerning physical availability as well as Rule 237 and modern discovery is unavailing. The likelihood exists that Dr. Hibbard would be biased against plaintiffs.

Defendants' argument concerning the doctor-patient relationship is also unavailing. While a doctor and patient have a fiduciary relationship (see *Witherell v. Weimer* (1987), 118 Ill. 2d 321, 331), Dr. Hibbard is also potentially liable to plaintiffs in this suit. Thus, while a fiduciary duty may have existed, the bias stemming from Dr. Hibbard's potential liability exists as well.

We finally note that defendants' fear that virtually any employee would have to be called to testify is without merit. Such employee would also have to posses information relevant to the case so that a reasonable person would have called the employee.

We conclude that the trial and appellate courts did

not err in finding Dr. Hibbard not equally available to plaintiffs.

## ii. *Reasonable Person Standard*

Defendants also argue that the trial and appellate courts erred in failing to require that a reasonable person would have called Dr. Hibbard to testify. Defendants argue that the courts did not require any showing that Dr. Hibbard had knowledge relevant to the disputed issue. However, this is not true, as Dr. Hibbard spent at least part of the day treating Jennifer, and the chart reflects a notation written under Hibbard's name that is adverse to defendants' interest. Even if Dr. Hibbard was not the note's author, she would have had that relevant information and perhaps some explanation as to its existence.

Much of defendants' argument is based on their assertion that the only period relevant in the lawsuit was from the time plaintiff arrived at the hospital until 12:28 p.m., the time when the fetal heart rate improved and the emergency Caesarean section was canceled. However, while this was plaintiffs' original theory, plaintiffs' complaint and closing arguments, as well as the jury instructions, reveal that the entire time prior to the decedent's birth was relevant.

Plaintiffs' complaint was broad enough to encompass the evidence at trial concerning the entire day's events. Plaintiffs' fourth-amended complaint alleged that defendants:

"[f]ailed to take adequate medical and surgical steps to control the condition of the baby which developed prior to and were occurring at the time of birth, prior to its death."

Such basis for liability was also reflected in the jury instructions, which phrased liability in terms of whether defendants:

"[f]ailed to properly follow the progress of the decedent baby prior to delivery and failed to undertake medical

steps, including the performance of a caesarean section delivery, necessary to prevent the death of decedent."

Finally, plaintiffs' closing argument to the jury conformed to the evidence at trial, as well as plaintiffs' complaint and jury instruction. Plaintiffs' counsel argued that the jury should remember as very important the dispute between Doctors Cibils and Hibbard about whether any late decelerations occurred. Moreover, plaintiffs' counsel argued that plaintiffs' burden of proof was to show that a Caesarean section or some procedure to save the baby's life should have been performed before the baby died.

We conclude that the trial court's actions were not an abuse of discretion.

### B. Plaintiffs' Counsel's Closing Arguments

Defendants next argue that plaintiffs' counsel's remarks during closing arguments exacerbated the prejudicial effect of the trial court's error in allowing a missing-witness instruction. Defendants believe the remarks were so prejudicial as to constitute reversible error in themselves.

During closing argument, plaintiffs' counsel stated:

"The most glaring evidence of [Dr. Cibils'] negligence is what you didn't hear in this case. You didn't hear from any of the doctors from the University of Chicago who worked side by side with him on this case. You didn't hear from those people he named as being on duty that day. You didn't hear from those people whose names appear over and over in the hospital chart, his co-workers at the University of Chicago, his brothers and sisters in this close knit fraternity of doctors. You didn't hear any of them come forward, take the witness stand, swear to tell the truth and tell you what happened that day, and he told you how many other doctors were involved in this case.

That was Dr. Hibbard, there was Dr. Smallwood, there was Dr. Anderson, there was Dr. Blanks, there was Dr. Michelletti.

\*\*\*

The reason that you can infer that none of these people came in to testify was that they couldn't say anything to back [Dr. Cibils] up. If they could, you would have to have tickets out here to keep them in line from coming in here, taking the oath and telling you that their boss, the doctor did the right thing. \*\*\* But you didn't hear from one of them and it's an insult to you that the only other doctor that you did hear from was Dr. Meadows, who had nothing to do with what was going on in labor and delivery.

\*\*\* Don't you want to hear, aren't you entitled to hear from the people who were there, from the people who actually participated in the delivery, the people who from 11:00 o'clock on administered to and cared for Jennifer Simmons? People like Gail Dennis, the nurse who was with her all day?

\*\*\* When your own people won't stand behind you and testify in your behalf, then you know you're wrong."

While defendants now object to this closing argument, they did not object at trial. Nor did defendants ask the court for a curative instruction. The appellate court found the issue waived, and we agree.

Failure to object to allegedly prejudicial remarks during closing argument generally waives the issue for review. (*Belfield v. Coop* (1956), 8 Ill. 2d 293, 311-12.) However, there exists an exception to this rule:

"If prejudicial arguments are made without objection of counsel or interference of the trial court to the extent that the parties litigant cannot receive a fair trial and the judicial process stand without deterioration, then upon review this court may consider such assignments of error, even though no objection was made and no ruling made or preserved thereon." (*Belfield*, 8 Ill. 2d at 313.)

This standard has been applied in cases involving "blatant mischaracterizations of fact, character assassination, or. base appeals to emotion and prejudice." *Gillespie v. Chrysler Motors Corp.* (1990), 135 Ill. 2d 363, 377.

We find that plaintiffs' counsel's remarks did not

deny defendants a fair trial or result in the deterioration of the judicial process. We further agree with the appellate court that an objection and instruction by the trial court would have cured any alleged error. Upon objection, the trial court could have instructed the jury that it was not permitted to draw any adverse inferences from defendants' failure to call certain witnesses because those witnesses were no longer under defendants' control. Moreover, as the appellate court noted, the court could have also instructed the jury that since plaintiffs did not call the witnesses either, no adverse inferences could be drawn against plaintiffs. If this were done, any prejudice the jury might have had would have been applicable to both parties for their failure to call the witnesses. Defendants could also have sought a sidebar and requested the judge to so instruct the jury.

Because defendants failed to do these things, the issue has been waived. Defendants should not benefit by their failure to object or request a sidebar and wait for a jury verdict, only to raise this issue in a post-trial motion and on appeal in hopes of a new trial.

## II.

### Motion *in limine*

Defendants also argue that the appellate court erred in affirming the trial court's ruling barring evidence and argument that plaintiffs had two children after the death of their son. Defendants argue that this ruling effectively precluded them from testing or refuting plaintiffs' claimed damages for loss of society.

Prior to the beginning of testimony, plaintiffs moved to bar any evidence concerning the fact that they had two children after the death of their son. The trial court granted the motion, finding such evidence irrelevant to the issue of damages. The appellate court affirmed this ruling.

Defendants argue on review that barring evidence of subsequent births was erroneous because the information was relevant to the extent of plaintiffs' losses. Defendants also argue that the decision is contrary to the principles applicable to claims for loss of consortium.

Plaintiffs' claim was brought under the Wrongful Death Act for loss of society. "The purpose of the Wrongful Death Act is to compensate the surviving spouse and next of kin for the pecuniary losses sustained due to the decedent's death." (*Elliott v. Willis* (1982), 92 Ill. 2d 530, 540; see also *Seef v. Sutkus* (1991), 145 Ill. 2d 336, 342 (Miller, specially concurring).) "The test [for damages] is a measurement of benefits of pecuniary value that the decedent might have been expected to contribute *** had the decedent lived." *Elliott*, 92 Ill. 2d at 541.

It is clear from this analysis that evidence of subsequent children is not relevant to a claim under the Wrongful Death Act for loss of society of a deceased child. The fact that subsequent children were born to plaintiffs is irrelevant to the issue of benefits the decedent might have been expected to contribute to the parents had the deceased lived. Moreover, as the appellate court noted:

> "In order to accept the argument, one must first accept the notion that the loss suffered by a parent upon the death of a child is somehow ameliorated with the birth of a subsequent child, a notion we categorically reject." 247 Ill. App. 3d at 183.

Defendants also argue that this conclusion is contrary to the principles applicable to the analogous area of loss of consortium. Defendants note that appellate decisions have held that evidence of a subsequent remarriage is relevant in loss of spousal consortium claims and, in fact, terminates the right of a widower or widow to recover damages for loss of consortium. This is so, defendants argue, even though the aggrieved party's re-

lationship with the new spouse might be of an entirely different nature and quality. See *Martin v. Illinois Central Gulf R.R.* (1991), 237 Ill. App. 3d 910, 922; *Dotson v. Sears, Roebuck & Co.* (1987), 157 Ill. App. 3d 1036, 1044-45; *Carter v. Chicago & Illinois Midland Ry. Co.* (1985), 130 Ill. App. 3d 431, 436.

We disagree and note that the relationship between parent and child is different from that of husband and wife. The parent-child relationship is not replaceable and is not limited to the society of only one child. Every child is unique, and the loss of society a parent suffers upon a child's death cannot be replaced with the society of a child subsequently born.

Defendants also argue that the trial court's ruling on the motion *in limine* was compounded by plaintiffs' trial counsel's closing arguments to the jury to the effect that defendants had deprived plaintiffs of the opportunity to have a family. However, defendants did not object to this argument at trial and have thus waived the argument for review.

For the reasons stated, the judgment of the appellate court is affirmed.

*Affirmed.*