AMY NEAL, Plaintiff-Appellant, v. UPENDRANATH NIMMAGADDA *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—95—1129

Opinion filed April 19, 1996.

Donald A. Shapiro and Adam B. Whiteman, both of Donald A. Shapiro, Ltd., of Chicago, for appellant.

James J. Stamos and Frederick W. Acker, both of Stamos & Trucco, of Chicago, for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiff Amy Neal (Neal) filed a medical malpractice action against Julia Litvin, M.D., Upendranath Nimmagadda, M.D., David Levine, M.D., and North Suburban Clinic, Ltd., which employed Drs. Levine and Nimmagadda. Neal voluntarily dismissed Drs. Litvin and

Levine, leaving Dr. Nimmagadda and North Suburban Clinic as the remaining defendants.

On November 1, 1994, a jury returned a verdict in favor of defendants. Plaintiff appeals the judgment and contends that the trial court erred by: (1) improperly limiting Neal's cross-examination of defendants' experts; (2) refusing to allow Neal to call defendants' experts as rebuttal witnesses; (3) granting defendants' motion *in limine* after the trial commenced; and (4) denying Neal's missing-witness instruction.

## BACKGROUND

In February 1987, Neal went to Dr. David Levine at the North Suburban Clinic due to occasional nose bleeds and wheezing. During his examination, Dr. Levine noted an enlargement or nodule on Neal's thyroid. Therefore, he referred her to Dr. Litvin, an endocrinologist. Over the next several months, Dr. Litvin unsuccessfully tried to shrink the nodule with medication. Dr. Litvin also performed two needle biopsies, which did not reveal the presence of malignant tumor cells. However, Dr. Litvin recommended that Neal undergo a surgical biopsy.

Dr. Litvin referred Neal to Dr. Nimmagadda for the surgery. The standard protocol for surgical biopsy is to remove the lobe of the thyroid containing the nodule and the isthmus, a thin piece of tissue connecting the two thyroid lobes. A frozen pathological specimen is examined while the patient is on the operating table. If it is malignant, then the surgeon removes the rest of the thyroid. If it is benign, the patient is closed. A further pathological review of the specimen is done within the next day or two and if the final pathological diagnosis is malignant, the patient is usually reoperated on to remove the rest of the thyroid tissue. The patient then undergoes radioactive iodine scanning and radioactive abatement.

On August 3, 1987, Dr. Nimmagadda removed the right lobe and isthmus of Neal's thyroid gland and, while she was on the operating table, sent the removed tissue to the hospital's pathologist, Dr. Eugene Goldman, for analysis. Dr. Goldman prepared a frozen section slide and diagnosed a "microfollicular adenoma" of the thyroid. This diagnosis meant that the tumor in Neal's thyroid was benign. Therefore, Dr. Nimmagadda closed the patient and did not remove the remainder of Neal's thyroid at that time.

On August 4, 1987, Dr. Goldman conducted additional studies and reached a final pathological diagnosis of "atypical follicular adenoma of the right lobule thyroid." Although he characterized the tumor as benign, he decided to send tissue samples to Dr. Louis Wei-

land, a renowned pathologist at the Mayo Clinic, for a second opinion because of the atypical features of some of the cells. The slides were sent to Dr. Weiland on August 6, 1987. Dr. Weiland examined the slides and authored a written report on August 7, 1987. Dr. Weiland concluded and advised Goldman in his report that the nodule was benign. Moreover, he noted that in endocrine tumors, the atypical features of the cells made it even more probable that the growth was benign.

Although Dr. Nimmagadda had not received the results from the Mayo Clinic, he decided to perform a second operation on Neal on August 7, 1987, to remove the rest of the thyroid. There was no emergency compelling Dr. Nimmagadda to perform the surgery on that day. He could have waited another day or two or postponed the surgery for several months. In fact, defendants' expert, Dr. DeGroot, testified that a surgeon who had knowledge of the Mayo Clinic's results would not have proceeded with the second operation.

Neal's treating physician, Dr. Stuart Fine, testified at trial that there are several reasons why the second lobe of the thyroid should not be removed if the nodule removed from the first lobe is pathologically benign. First, it would be unnecessary and unjustified surgery carrying with it the usual surgical risks of anesthesial complications, infection and operative mishaps. Second, removal of the remainder of the thyroid makes the patient permanently hypothyroid—the patient must be maintained on artificial thyroid for the rest of her life. Third, thyroid surgery risks damage to the laryngeal nerve and can leave a patient with an impaired ability to speak. Fourth, removal of the second lobe exponentially increases the risk of permanent damage to the parathyroid glands, which are very small glands located in and around the thyroid glands. These small glands regulate the body's metabolism of calcium, and damage to these glands can cause a life-threatening condition. Dr. Weiland's pathological report revealed that one parathyroid gland had already been inadvertently removed along with the first lobe of Neal's thyroid.

Generally, when cancer is diagnosed, the standard protocol is to remove the remainder of the thyroid and then to scan the body for thyroid cells that have escaped the main mass of thyroid tissue removed during surgery. If scanning is positive, the thyroid tissues must be radiated and destroyed. Dr. Levine's progress note of August 6, 1987, indicated that, prior to surgery, this was the plan for Neal. However, after receipt of the Mayo Clinic's report, Dr. Nimmagadda did not follow through with the plans for radioactive iodine scanning and ablation.

Because of the high risk of damage to the parathyroid glands

from the complete thyroidectomy, it is mandatory to check the patient's calcium levels post-operatively. If the levels are abnormally low, calcium replacement and massive doses of vitamin D, which helps the body metabolize the calcium, must be rendered. On August 8, 1987, Neal's calcium level was abnormally low. However, Dr. Nimmagadda did not order any calcium or vitamin D treatments and he discharged Neal.

Within a few days, Neal began suffering muscle spasm that became increasingly severe and painful. By the morning of August 13, 1987, she was in extreme agony, she couldn't move her legs, she could barely speak and had to be rushed to the emergency room. Neal was suffering from calcium tetany, a life-threatening condition caused by a lack of calcium that can affect every muscle in the body, including the heart and the muscles that control bleeding. Neal spent one day in intensive care and three additional days in the hospital until her system was stabilized. Since Neal's hospitalization, she has been on replacement calcium and either massive doses of vitamin D or a synthetic vitamin D replacement. She is periodically monitored for calcium levels and for potential vitamin D toxicity. Also, she is on artificial thyroid hormone.

Neal filed suit in 1994 and subsequently filed an amended complaint on October 20, 1994. Neal's complaint alleged that Dr. Nimmagadda negligently and carelessly removed part of her thyroid gland and failed to monitor, control and/or treat her calcium level post-operatively. Prior to trial, Neal propounded Rule 220 (134 Ill. 2d R. 220(b) (repealed eff. January 1, 1996)) interrogatories to Dr. Nimmagadda to determine the identity of his experts. Dr. Nimmagadda answered that Dr. Edward Paloyan (Paloyan) and Dr. Leslie DeGroot (DeGroot) would testify regarding the liability and damage issues in the case and the basis of their opinions could be found in their respective deposition transcripts.

During his deposition, Paloyan testified that Neal should not have been sent home with her calcium level decreasing and without treatment to help correct the calcium level. Dr. DeGroot testified at his deposition that it was Dr. Nimmagadda's responsibility to insure that Neal's calcium level was sufficient.

At trial, defendants' defense counsel brought a motion to preclude Neal from questioning DeGroot and Paloyan regarding their opinions as to Dr. Nimmagadda's post-operative care, claiming that those opinions would go beyond the scope of DeGroot's anticipated direct examination. Defense counsel stated that the experts' direct examinations would only address questions of whether the second surgery to remove the remainder of Neal's thyroid was appropriate. Defendants

also argued that because Neal did not name DeGroot and Paloyan as Rule 220 experts for the purpose of expressing opinions related to the activities at discharge, those opinions could not be explored on cross nor could Neal call them on rebuttal. The trial court agreed with the defendants and granted defendants' motion.

Subsequent to the trial court's grant of the motion *in limine,* Neal sought the court's permission to question the experts regarding whether they reviewed any records that related to Neal's discharge. Neal argued that the experts did, in fact, review these materials and their failure to render opinions on these matters was akin to a missing witness in that they were retained to provide consultation by the defense on all matters relating to liability. However, defendants failed to inquire about issues relating to discharge. The trial court ruled that this questioning would also go beyond the scope of cross-examination. After trial, the jury rendered a verdict in favor of the defendants. Neal appealed. We affirm.

ANALYSIS

■ Neal first contends that the trial court improperly limited her cross-examination of the defendants' experts, DeGroot and Paloyan. Neal states that her cross-examination of the experts would not have exceeded the scope of direct examination. The proper scope of cross-examination is not limited to the actual material discussed during direct examination, but to the subject matter of direct examination. *Kurrack v. American District Telegraph Co.,* 252 Ill. App. 3d 885, 902, 625 N.E.2d 675 (1993). However, "a litigant may properly develop on cross-examination circumstances lying within the witness' knowledge, which explain, discredit or destroy the witness' testimony on direct. [Citation.] Such is the case even though the information may not have been given on direct examination." *Leonardi,* 262 Ill. App. 3d at 418. For example, facts, data, and opinions which form the basis of the expert's opinion but which are not disclosed on direct examination may be developed on cross-examination. *Piano v. Davison,* 157 Ill. App. 3d 649, 670, 510 N.E.2d 1066 (1987). The extent of cross-examination is left to the broad discretion of the trial court, whose decision will not be disturbed unless the trial court abused its discretion, resulting in manifest prejudice to a party. *Creighton v. Thompson,* 266 Ill. App. 3d 61, 69, 639 N.E.2d 234 (1994).

Neal relies on *Leonardi* and *Toppel v. Redondo,* 247 Ill. App. 3d 211, 617 N.E.2d 403 (1993), to support her argument that her cross-examination of defendants' experts would not have been outside the scope of direct examination. In *Leonardi,* the plaintiff asserted that the trial court erroneously permitted defendants to cross-examine

another expert on the issue of proximate cause when he was retained solely on the issue of negligence. The plaintiffs questioned the expert on direct examination concerning deviations from the standard of care by defendants. On cross-examination, defendants inquired whether the deviations proximately caused plaintiff's injuries. The court held that this questioning was outside the scope of the direct examination, but the cross-examination was proper because proximate cause is a necessary element to be proved in every medical malpractice action. Therefore, the defendants were entitled to develop the expert's testimony on cross-examination that defendant had violated the standard of care. *Leonardi*, 262 Ill. App. 3d at 418.

In *Toppel*, the plaintiff injured her knee and she was treated by Dr. Redondo, an orthopedic surgeon, who performed surgery on her knee. Plaintiff was subsequently seen by another orthopedic surgeon, Dr. Fossier, who performed reconstructive surgery of her knee. Plaintiff filed a medical malpractice action against Dr. Redondo and appealed from a jury verdict in favor of Dr. Redondo. On appeal, plaintiff contended that defendant's cross-examination of Dr. Fossier was beyond the scope of direct examination. On direct, the plaintiff asked questions regarding Dr. Fossier's care and treatment of the plaintiff and no questions or responses were given regarding the appropriateness of Dr. Redondo's care. However, on cross-examination, Dr. Fossier was allowed to testify about a letter he wrote declining to testify as an expert on plaintiff's behalf. In the letter, Dr. Fossier stated: "While I do not necessarily agree with the way Dr. Redondo proceeded with the treatment of Ms. Toppel's torn anterior cruciate ligament, I do not think that based on the review of the records which you have provided that his care necessarily constitutes a claim of malpractice." *Toppel*, 247 Ill. App. 3d at 213. The appellate court held that although the cross-examination of Dr. Fossier went beyond direct, the letter was relevant, as it bore directly on whether defendant's treatment of plaintiff constituted malpractice. The court further held that, contrary to plaintiff's assertion, plaintiff was not prejudiced by the introduction of the evidence at the improper time. *Toppel*, 247 Ill. App. 3d at 214.

■ The above cases are distinguishable from the case *sub judice*. Here, DeGroot and Paloyan were questioned regarding whether the second surgery to remove the remainder of Neal's thyroid was appropriate. Neal sought to cross-examine the experts regarding her discharge and post-operative care. Although the issue of Neal's discharge may be related to the propriety of the second surgery, we believe that the discharge is a wholly separate matter and not an element to prove that Dr. Nimmagadda wrongfully removed the

remainder of Neal's thyroid. We also reject Neal's assertion that the cross-examination would be highly probative of Nimmagadda's credibility. One may go outside the scope of direct examination to test the credibility of the witness. See *Creighton*, 266 Ill. App. 3d at 69-70. However, we fail to see how cross-examination of the experts regarding Neal's discharge would test the experts' credibility.

■ Neal next contends that the trial court committed reversible error by refusing to allow her to call Drs. DeGroot and Paloyan as rebuttal witnesses. The trial court refused to allow rebuttal testimony by the experts for Neal because they were never identified as experts under Supreme Court Rule 220 (134 Ill. 2d R. 220(b) (repealed eff. January 1, 1996)). Rule 220 stated in pertinent part:

"In order to insure fair and equitable preparation for trial by all parties the identity of an expert which is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later. In any event, as to all expert witnesses not previously disclosed, the trial court, on its own motion, or on the motion of any party after the first pretrial conference, shall enter an order scheduling the dates upon which all expert witnesses, *including rebuttal witnesses*, shall be disclosed. *** All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence. *** Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." (Emphasis added.) 134 Ill. 2d R. 220.

Rule 220 was adopted with the hope of eliminating situations where either an expert's late or surprise testimony is permitted to the opponent's prejudice, the opinions are refused to the detriment of the offering party, the trials are continued, or the allowance or denial of the testimony produces reversible error and the cause must be retried. 134 Ill. 2d R. 220, Committee Comments, at 179. "Rule 220 attempts to eliminate these evils by establishing a uniform, but not inflexible, framework for the timely revelation of the identity of expert witnesses and the subject matter of their testimony." 134 Ill. 2d R. 220, Committee Comments, at 180.

■ The imposition of sanctions for a violation of Rule 220 is within the discretion of the trial court, whose decision will not be disturbed absent a clear showing of an abuse of that discretion. The purpose of

a sanction is not to punish, but to insure fair discovery and a trial on the merits. *Flanagan v. Redondo*, 231 Ill. App. 3d 956, 963, 595 N.E.2d 1077 (1991). Barring a witness' testimony is only one sanction available to the court. *Kurrack*, 252 Ill. App. 3d at 903; see *Sohaey v. Van Cura*, 158 Ill. 2d 375, 381, 634 N.E.2d 707 (1994). Each case, however, presents a unique factual situation which is to be considered in determining whether a sanction is to be imposed. *Boatmen's National Bank v. Martin*, 155 Ill. 2d 305, 314, 614 N.E.2d 1194 (1993).

Neal relies on *Flanagan v. Redondo*, 231 Ill. App. 3d 956, 595 N.E.2d 1077 (1991), and *Sohaey v. Van Cura*, 158 Ill. 2d 375, 634 N.E.2d 707 (1994), to support her contention that the court's ruling amounted to a punishment of a technical violation because there would not have been a surprise to defendants if she had called De-Groot and Paloyan in rebuttal. In *Sohaey*, plaintiffs disclosed their original standard-of-care expert in a timely fashion. The trial judge deemed the disclosed expert competent to testify. A successor judge, however, granted defendants' subsequent motion *in limine* to bar the disclosed witness on the eve of the then-established trial date. Plaintiffs then disclosed a new expert 63 days before a new trial date. At the pretrial conference, one month before the trial, the trial court barred this new expert because plaintiff disclosed the expert after the expert disclosure date. The trial court noted that it was without discretion to formulate any other sanction. The appellate court reversed and the Illinois Supreme Court affirmed the appellate court. The supreme court stated that the disqualification was antithetical to the purpose and intent of Rule 220 because barring the second expert could not have been required to prevent surprise. The court held that the defendant could not have been surprised or prejudiced in light of the fact that plaintiff's substitute expert was disclosed over two months before trial. The court concluded that for a seemingly harmless technical violation, plaintiffs were prejudiced and denied the opportunity to establish an important aspect of their cause of action. *Sohaey*, 158 Ill. 2d at 383.

In *Flanagan*, plaintiff's occurrence witness presented new evidence at trial on cross-examination to the surprise of both plaintiff and defendant. The trial court allowed the defendant's experts to testify regarding the new evidence, but prohibited the plaintiff's experts from doing so because this new testimony had not been disclosed pursuant to Rule 220 as a basis for the plaintiff's expert's opinions. The appellate court reversed, holding that the trial court abused its discretion in light of the fact that the failure to give defendant prior notice of the new evidence was not due to plaintiff's fault or circumstances in plaintiff's control. The court also noted that the

defendant was not prejudiced by the testimony since the defendant was able to respond to the new evidence at trial through its expert's testimony. However, the court limited its holding to occurrence witnesses who present newly discovered evidence. The court emphasized that it did not decide how it would resolve the case if the expert witness, rather than an occurrence witness, had discovered the evidence. *Flanagan*, 231 Ill. App. 3d at 967.

■ In this case, however, we believe that Neal's failure to call DeGroot and Paloyan as experts under Rule 220 was more than a technical violation. We agree with defendants that they would have been seriously prejudiced by Neal's Rule 220 violation because their own experts would have been used against them without notice before trial. Unlike the plaintiff in *Flanagan*, Neal's failure to call DeGroot and Paloyan as rebuttal witnesses was within her control. Neal's counsel was aware of the criticisms that DeGroot and Paloyan expressed regarding Neal's post-operative care during their depositions. Neal should not have relied upon defense counsel to address this matter. Moreover, Neal did address this matter because her witness, Dr. Fine, testified that Dr. Nimmagadda violated the standard of care by sending Neal home without any follow-up care regarding the low calcium level.

Neal cites to *Taylor v. Kohli*, 162 Ill. 2d 91, 642 N.E.2d 467 (1994), to argue that she was not required to retain Paloyan and DeGroot as her expert witnesses as a condition of examining them. In *Taylor*, the plaintiff disclosed a physician as an expert witness pursuant to Rule 220, and defendant deposed him. Nineteen months before trial, plaintiff informed defendant that the physician would not be called and was no longer plaintiff's expert. Defendant denied receiving notice. At trial, plaintiff did not call the physician, so defendant sought to have the physician's unfavorable deposition testimony read into evidence on the basis that it constituted an admission against plaintiff's interest. Defendant also sought a missing-witness instruction. The trial court granted both of defendant's requests and the jury ultimately found in defendant's favor. The appellate court reversed and the supreme court affirmed the appellate court. The court held that a party may give notice of abandonment of a witness and avoid a missing-witness instruction if the notice is given to the other party a reasonable time prior to trial. *Taylor*, 162 Ill. 2d at 98.

The case *sub judice* is inapposite to *Taylor*. Here, Drs. DeGroot and Paloyan were not abandoned by defendants because they testified at trial. We disagree with Neal's assertion that *Taylor* stands for the proposition that an expert must be abandoned before an opposing party can retain and disclose the expert as his witness.

Neal further contends that she did not have to disclose Paloyan and DeGroot as experts because she did not "retain" them. Under Rule 220, we note that our supreme court, in *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 529 N.E.2d 525 (1988), stated that Rule 220 obligates litigants to disclose the identity and opinions of those witnesses who are engaged for the purpose of giving an expert opinion at trial. In the instant case, the trial court responded to plaintiff's counsel's request to call Dr. DeGroot as a rebuttal witness by stating:

"THE COURT: You would have had to disclose him and you would have to bring him in and say this is what he is going to say. I mean that's the way the rule comes out. That's the way the cases have interpreted it. If you like what somebody said, you don't have to have abandonment by the other party. You can just say I like what that person said, I'm going to disclose him for my expert for this limited purpose, and I will call him. And you have that right. But you have to do it under Rule 220."

The ruling of the trial court conformed to the requirements of Supreme Court Rule 220.

Neal also asserts that the disclosure of Paloyan and DeGroot is analogous to disclosure of treating physicians because there is no element of surprise. We disagree. The element of surprise is only one aspect that differentiates a treating physician from an expert witness. Unlike expert witnesses, treating physicians are not retained to render an opinion at trial but are consulted, whether or not litigation is pending or contemplated, to treat a patient's physical or mental problem. A treating physician's opinions are developed in the course of treating the patient and, in fact, his opinions are similar to those of occurrence witnesses who testify because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation. *Tzystuck*, 124 Ill. 2d at 234-35.

Clearly, DeGroot and Paloyan were expert witnesses. Their retention was not based on on-going treatment that they rendered to Neal. They were consulted specifically to render an opinion at trial.

■ Neal next contends that the trial court's ruling to grant defendant's motion *in limine*, seeking to prevent her from questioning DeGroot and Paloyan on the discharge issue, was untimely because the motion was brought during the trial instead of as a pretrial motion. However, there is no authority that states that a motion *in limine* must be embodied in a pretrial motion. "A motion *in limine* permits a party to obtain *in advance*, an order excluding inadmissible evidence and prohibiting interrogation concerning such evidence." (Emphasis added.) *Cunningham v. Millers General Insurance*

*Co.*, 227 Ill. App. 3d 201, 205, 591 N.E.2d 80 (1992). A motion *in limine* may be brought either before or during trial. *Pepper v. Marks*, 168 Ill. App. 3d 253, 256, 522 N.E.2d 688 (1988). Here, defendants brought the motion prior to calling their experts, seeking to prohibit Neal from interrogating the experts regarding the post-operative care. We fail to see how this prejudiced Neal.

■ Neal also asserts that the trial court's grant of the motion *in limine* was highly prejudicial because defense counsel was allowed to remind the jury in closing argument that plaintiff's counsel failed to produce evidence that he had promised at the beginning of trial. During opening statement, Neal's counsel stated:

"[Dr. DeGroot] is going to testify that if Dr. Nimmagadda had received the report from the Mayo Clinic before the second operation that the standard of care would have been not to do the surgery. He also concedes that it was negligent to let Amy Neal go home without acting on her abnormal calcium levels."

During closing argument, defense counsel stated:

"Finally, this question of discharge. You know at the beginning of this case, Mr. Shapiro told you that Dr. DeGroot was going to testify that the discharge violated the standard of care. DeGroot didn't say that. You never heard that. He had no opinion on that."

Defendants contend that Neal has waived this argument. We agree. To preserve an issue for appeal, a party must raise the issue in a post-trial motion or object at trial. *Wilson v. Clark*, 84 Ill. 2d 186, 189, 417 N.E.2d 1322 (1981). Neal neither objected to this statement at trial nor raised this issue in her post-trial motion. Therefore, the issue is waived.

■ Lastly, Neal contends that she was entitled to a missing-witness instruction regarding defendants' failure to inquire of the defense experts about the precipitous discharge. In general, the missing-witness instruction is available when: (1) the missing witness was under the control of the party to be charged and could have been produced by reasonable diligence; (2) the witness was not equally available to the opposing party; (3) a reasonably prudent person would have produced the witness if he believed that the testimony would be favorable; and (4) there is no reasonable excuse shown for the failure to produce the witness. *Taylor*, 162 Ill. 2d at 97; *Simmons v. University of Chicago Hospital & Clinics*, 162 Ill. 2d 1, 7, 642 N.E.2d 107 (1994). Whether to use the instruction or to permit the argument is within the sound discretion of the trial court. *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 22, 541 N.E.2d 643 (1989).

Neal's contention is not well founded because Drs. DeGroot and

Paloyan were not missing witnesses. They testified at the deposition as well as at trial. Therefore, we hold that the trial court did not abuse its discretion by denying Neal's missing-witness instruction.

For the reasons cited herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY, P.J., and GORDON, J., concur.