NOTICE

Decision filed 11/27/07. The text of
this decision may be changed or
corrected prior to the filing of a
Petition for Rehearing or the
disposition of the same.

NO. 5-06-0291

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| BRANDON BAUER, an Infant, by Scott Bauer, His Father and Next Friend, and SCOTT BAUER and AMY BAUER, Individually, | ) Appeal from the<br>) Circuit Court of<br>) St. Clair County.<br>) |
| Plaintiffs-Appellees, | )<br>) |
| v. | ) No. 00-L-373<br>) |
| MEMORIAL HOSPITAL, | ) Honorable<br>) James M. Radcliffe III, |
| Defendant-Appellant. | ) Judge, presiding. |

_____

JUSTICE STEWART delivered the opinion of the court:

The defendant, Memorial Hospital[1] (Memorial), appeals from the judgment of the circuit court of St. Clair County on the jury's verdict in the amount of $7.15 million in favor of the plaintiffs, Brandon Bauer, an infant, by Scott Bauer, his father and next friend, and Scott Bauer and Amy Bauer, individually, and against Memorial in the plaintiffs' medical malpractice action. Memorial raises numerous arguments on appeal. We affirm in part, vacate in part, and remand for further proceedings.

BACKGROUND

Memorial was one of several defendants named in a medical malpractice action filed

_____

[1]Although it is apparent from the record that the correct name of the defendant is "Protestant Memorial Medical Center, Inc.," all the parties have continued to use "Memorial Hospital" in the caption of this case. The defendant does not deny liability as a result of this misnomer.

1

by the plaintiffs, alleging that the defendants were responsible for causing, or contributing to cause, brain damage and other injuries to Brandon due to their failure to recognize and/or adequately treat his hypoglycemia, *i.e.*, his abnormally low blood sugar. Before trial, the plaintiffs dismissed several of the defendants, including St. Louis Children's Hospital (Children's Hospital). Therefore, when the trial began, the only remaining defendants were Memorial, Dr. Pam Conard, and Dr. Conard's employer, Belleville Emergency Physicians.

Amy Bauer, Brandon's mother, testified that she and her husband, Scott, have two children–Brandon, who was born on December 4, 1998, and Jeremy, who was born on May 13, 2001. Amy is a registered nurse. Amy's pregnancy with Brandon was normal, and he was born on December 4, 1998, at 8:54 p.m. He was given Apgar scores at one and five minutes after birth, and he scored a 9 out of 10 both times. He did not score a 10 because he was blue in color, but his color was normal 10 or 15 minutes after his birth. Amy decided to breast-feed him because she thought that it would make him healthier. He fed well on the evening of his birth and the following day.

On December 6, 1998, the second day after his birth, Brandon fed well until late in the afternoon. Lisa Lyles was the nurse on the 3-to-11 p.m. shift. Amy and Lyles were friends and had worked together before Lyles began working at Memorial. Amy fed Brandon from about 3:15 until 3:35 p.m. Lyles left the room while he fed. When she returned, Amy told her that Brandon had fed well. Amy tried to feed Brandon again at about 3:45 or 4 p.m., but he would not eat. She tried again at about 5:15 or 5:30 p.m., but again, he would not eat. Amy told Lyles that he would not eat. Lyles told Amy that he would eat when he was ready. Lyles approached Amy at approximately 7 p.m. to begin the discharge procedures. Amy told Lyles that Brandon had not eaten since the 3:15 p.m. feeding. Lyles said that it was not a concern, that he would eat when he was hungry, that it would be a more relaxed situation when they went home, and that he would eat then.

2

Lyles had taken Brandon's temperature at approximately 3 p.m., and it was normal. Amy testified that she first became aware that his temperature was low at approximately 7 p.m. when Lyles took his axillary temperature, *i.e.*, the temperature under his armpit. Amy testified that Lyles told her that his temperature was 35 degrees Celsius, which Amy thought was approximately 96 degrees Fahrenheit but which was, in fact, 95 degrees Fahrenheit. Lyles told Amy that Brandon's temperature would have to be 98 degrees Fahrenheit before he could be discharged. She told Amy to wrap another blanket around him and that she would be back. When she returned, she again took Brandon's temperature, but it was still low. She told Amy to wrap another blanket around him and that she would be back. When she returned, she again took his temperature, but it was still low. At Scott's request, she got a different thermometer and again took Brandon's temperature, but it was still low. She indicated that she was going to take Brandon to another nurse for advice. She took Brandon, who was still wrapped in several blankets, out of the room. Amy testified that when Lyles returned at about 7:45 or 8 p.m., she said that she and the nursery nurse had put Brandon under a warming light for about 15 minutes; that they had then taken his rectal temperature, which was normal; and that he was ready to go home.

Amy had continued to try to feed Brandon until he was discharged at approximately 8 p.m., but he would not eat. At discharge, Amy again expressed concern to Lyles about the fact that Brandon had not eaten since 3:15 p.m. Lyles again told Amy that he would eat when he was hungry, that they would be more comfortable at home, and that she should not worry about it. Lyles told Amy that she would be on duty until 11:30 p.m. and that Amy could call her if she had any problems.

Amy testified that she, Scott, and Brandon left the hospital between 8 and 8:15 p.m. and arrived home at approximately 8:30 p.m. She woke Brandon and tried to feed him, but he still would not eat. When she tried to feed him again at 9 or 9:30 p.m., his eyes rolled

3

back in his head, he seemed limp and groggy, and Amy could not wake him.

Amy testified that she called Lyles and told her that Brandon was limp and groggy, that his eyes had rolled back in his head, and that he would not eat. According to Amy, Lyles told her that babies' eyes roll back in their heads, that he was probably just in a deep sleep, that it was nothing to worry about, that he would eat when he was hungry, and that Amy could call her back again if she continued to have trouble. Lyles did not tell Amy to bring Brandon back to the hospital or to call his doctor.

Amy continued to try to feed Brandon, but he would not eat. Amy testified that at 11 or 11:30 p.m., she called Lyles a second time and told her that Brandon was still not eating. Amy testified that Lyles told her that it was nothing to worry about, to try using a cup to feed him, and if that did not work, to try using a bottle. Lyles did not advise her to call the hospital or the doctor if she continued to have problems. Amy tried feeding Brandon formula with a measuring cup and with a bottle but was unsuccessful.

During the night, Brandon woke up and cried every hour to hour and a half. Each time, Amy got up and tried to feed him, but he would not eat. He had dark and tarry stools. At about 2 or 3 a.m., Amy took Brandon's rectal temperature, which was normal.

Amy testified that at approximately 5 a.m. the following morning, December 7, she called the hospital again and spoke with an unidentified nursery nurse. Amy told the nurse that Brandon had not eaten since 3 or 3:15 p.m. the previous afternoon, that she could not tell if he was urinating but that he was stooling, that he had a weak cry, and that he woke up every hour or hour and a half, but she could not get him to eat. The nurse did not ask Amy about Brandon's temperature, and Amy could not recall whether she told the nurse that several axillary temperatures taken the previous afternoon had been low. The nurse told Amy to put a cold "wash rag" on Brandon's head to wake him up and that he would then eat.

Amy then called her mother, who arrived at approximately 7:30 a.m. Amy's mother

4

tried to wake Brandon but could not do so. He went limp in her arms. They tried to call his doctor, but she was not in the office.

They took Brandon to the emergency room at Memorial, arriving at approximately 8:45 a.m. Amy told the emergency room personnel that Brandon's temperature had been low the previous afternoon and that he was not eating. At that time, he had a blank stare. The emergency room personnel checked his blood-sugar level, and it was extremely low. The emergency room personnel repeatedly tried to start an intravenous line on him but could not do so. Instead, they gave him fluids through a nasogastric tube.

At 10:37 a.m., a team from Children's Hospital arrived and began caring for Brandon. Because they were unable to establish an intravenous line, they did an umbilical cord cutdown instead. They took Brandon to Children's Hospital by helicopter. The following day, he began having seizures, and he was in the hospital until December 30.

Dr. Robert Kirkwood, a radiologist, board certified in diagnostic radiology and neuroradiology, opined that Brandon's brain scans showed permanent damage caused by severe hypoglycemia, that the brain damage had begun at approximately 9 p.m. on the evening of discharge, and that most of the brain damage had occurred before Brandon was diagnosed with severe hypoglycemia at the emergency room the following morning.

Scott Bauer testified regarding Brandon's birth, the medical care he received at Memorial after his birth, Amy's telephone calls to the nurses after he was discharged, and his care at the emergency room. Scott's testimony was generally consistent with Amy's testimony. Scott also testified that he had videotaped approximately two hours of Brandon in his ordinary daily life and that his attorney had edited the videotape down to 40 minutes. The edited version was played for the jury.

Dr. Pam Conard, Brandon's emergency room physician at Memorial, gave a discovery deposition, which was read to the jury. Dr. Conard testified that when Brandon arrived at

the emergency room at approximately 9 a.m. on December 7, he was lethargic and jaundiced, and his parents said that he had not eaten since leaving the hospital the day before. The emergency room personnel checked his blood sugar at 9:10 and 9:23 a.m., and his blood-sugar levels were 13 and 11. His temperature was 97.2. Dr. Conard diagnosed him with severe hypoglycemia. Dr. Conard spoke with Brandon's doctor, and they agreed that he needed to be transferred to a hospital with a higher level of pediatric care. Dr. Conard spoke with a doctor at Children's Hospital, who agreed to send a transport team to Memorial. Despite numerous attempts, the emergency room personnel were unable to insert an intravenous line in order to treat Brandon's hypoglycemia. They tried to raise his blood-sugar level by giving him glucose through a nasogastric tube, by dripping glucose into his mouth, and by placing cotton swabs with sugar solutions under his tongue. His blood-sugar level increased from 11 shortly after admission at 9 a.m. to 36 at 10:10 a.m.

The transport team from Children's Hospital arrived at 10:37 a.m. Brandon's blood-sugar level at 10:42 a.m. was 50. The transport team tried unsuccessfully three times to insert an intravenous line. At 11:04 a.m., they inserted an umbilical line by performing an umbilical cutdown procedure, which entailed cutting through the umbilical line to provide direct access to a vein. Dr. Conard testified that she had not tried to perform an umbilical cutdown procedure because she was not sufficiently familiar with the procedure.

Dr. David Tarlow, who is board certified in emergency medicine, testified that it is necessary to raise a severely hypoglycemic patient's blood-sugar level quickly because certain parts of the body, including the brain, must have blood sugar or they die or have dysfunction, and the more time the brain is deprived of sugar, the more dysfunction and death will occur. Dr. Tarlow opined that Dr. Conard deviated from the standard of care in treating Brandon by failing to initiate on an emergency basis the infusion of dextrose in order to minimize his brain damage and that Dr. Conard's negligence caused or contributed to

6

cause his injuries.

Tracy Jo Simeon, a nurse who works with newborns, testified that Memorial's nurses deviated from the standard of care in failing to document that Brandon's temperature was stable during the 12-hour period before discharge, in failing to notify his doctor of his temperature instability before discharge, in failing to advise his doctor that he had not eaten since the 3:15 p.m. feeding when he was being discharged at 7 or 8 p.m., and in failing to test his blood-sugar level and communicate the results to his doctor before discharge. Simeon also opined that if Amy's testimony about her phone calls to the nurses after discharge were true, the nurses deviated from the standard of care in failing to tell her to bring Brandon back to the hospital or to call his doctor.

Dr. Howard Harris, a board-certified pediatrician and neonatologist, opined that a newborn should have a stable and normal axillary temperature for 12 hours prior to discharge, that the baby's axillary temperature should be in the range of 97 to 98.6 degrees Fahrenheit in an open crib with appropriate clothing, and that Memorial deviated from the standard of care in discharging Brandon because he had not had a stable and normal axillary temperature for 12 hours prior to discharge. Dr. Harris also opined that Memorial violated its own policy that a rectal temperature may be taken at birth but that, thereafter, only axillary temperatures are to be taken unless the doctor orders otherwise. Dr. Harris also opined that Memorial deviated from the standard of care in discharging Brandon, given his history of poor feeding and unstable temperature, in not checking his blood sugar to test for hypoglycemia before discharge, in discharging him without notifying his doctor of his unstable temperature and poor feeding, in failing to tell Amy to return him to the hospital or to call his doctor when Amy called to talk to the nurses after discharge, and in failing to have emergency room personnel who were capable of performing an umbilical cutdown or interosseous infusion if an intravenous line could not be started. Dr. Harris also opined that

7

Brandon's brain damage was caused by the hypoglycemia, that Memorial's deviations from the standard of care caused or contributed to cause his injuries, that his injuries were permanent, that he had serious neurologic disability and would need continuing care for the rest of his life, and that his injuries would not have occurred had his blood-sugar level been checked and the hypoglycemia detected by 9 p.m. on the evening he was discharged.

The evidence deposition of Dr. Jennifer Kwon, a pediatric neurologist who treated Brandon at Children's Hospital, was played for the jury. Dr. Kwon opined that Brandon's brain injury was caused by the hypoglycemia.

Jan Klosterman, a registered nurse and certified life-care planner, testified that Brandon will always have difficulty performing the activities of daily living. Klosterman testified that, considering Brandon's likely future needs, the plaintiffs were likely to incur costs of care associated with his injuries of between approximately $3.3 and $7.3 million.

The evidence deposition of Dr. Charles Deitzen, a physiatrist, was played for the jury. Dr. Deitzen testified that on the referral of Dr. Mark Goetting, he had reviewed Brandon's medical records and examined him. Dr. Deitzen testified regarding Brandon's future expectations for physical and cognitive development and treatment. Dr. Deitzen reviewed Klosterman's life-care plan and, after making a few corrections, approved it.

Professor Leroy Grossman, an economist, interpreted the costs set forth in Klosterman's life-care plan and reduced those costs to a present cash value of between approximately $2.9 and $3.4 million. Dr. Grossman also opined that Brandon's calculated wage loss ranged from approximately $1.1 to $1.8 million.

Dr. Mark Goetting, who is board certified in pediatrics, neurology, and psychiatry, testified that a neonatal brain is very dependent upon glucose as fuel; that the brain will not function without it; and that in the prolonged absence of glucose, brain cells will die. He testified that hypoglycemia is fairly common in newborns and that signs of hypoglycemia

8

in newborns include the following: breathing difficulties, irritability, jitteriness, lethargy, seizures, low temperature, floppiness, unconsciousness, and poor eating. He testified that a nurse has a duty to report those symptoms and signs to a doctor, that a baby with such symptoms should not be discharged, and that a nurse should not allow a baby to be discharged without checking for hypoglycemia if he has an unstable temperature, poor eating, or lethargy. He testified that a nurse can check for low blood sugar by performing a simple finger stick. He also testified that if a baby with a history of poor eating and low temperature were discharged, and after discharge the baby would not eat, was lethargic and groggy, with his eyes rolling back in his head, and was difficult to arouse, and the parents notified the hospital of the baby's condition, the hospital should advise the parents to bring the baby directly to the doctor's office or the emergency room.

Dr. Goetting further testified that a baby with a blood-glucose level of 13 is severely hypoglycemic and that when a severely hypoglycemic newborn is brought into the emergency room, one of the highest priorities is to normalize the blood-sugar level, which is usually done by giving an intravenous sugar solution. He testified that if intravenous access is not possible, it is unacceptable to let the baby suffer with such a low blood sugar because the blood-sugar level needs to be brought up quickly. He opined that the blood-sugar level should be brought up to the normal range, between 70 and 100. He testified that one easy alternative to an intravenous line is an interosseous device, *i.e.*, instead of putting a needle in a vein, the needle goes in a bone (usually the shin bone), and it functions like an intravenous line. He opined that putting cotton swabs dipped in sugar solution in the baby's mouth and dripping 30% glucose water through a nasogastric tube were not adequate to treat hypoglycemia in a newborn.

Dr. Goetting also opined that Brandon's brain damage and all of his neurological problems were caused by the hypoglycemia, which occurred during the first few days of his

9

life, and that his medical conditions are permanent. He also opined that, because of the diversity and severity of his disability, Brandon would need custodial care for the rest of his life and that his life expectancy should be similar to the average person's.

On cross-examination, defense counsel attempted to review Dr. Goetting's Supreme Court Rule 213 (210 Ill. 2d R. 213) disclosures, which were directed toward Children's Hospital. The trial court barred defense counsel from eliciting any testimony from Dr. Goetting regarding his disclosed opinions against the other defendants. The defendants made an offer of proof, which established that he would have testified that Children's Hospital deviated from the standard of care in treating Brandon and that Children's Hospital's deviation contributed to Brandon's brain injury. After Dr. Goetting testified, the plaintiffs rested.

Lisa Lyles testified that she was Brandon's nurse at Memorial on the 3-to-11 p.m. shift on December 6, 1998. At 3:40 p.m., after Brandon had eaten at 3:15 p.m., his doctor gave her approval to discharge him. Lyles testified that when she went into Amy's room at 4:45 p.m., Brandon was nursing, so she said she would come back later.

Lyles testified that she returned at 5:20 p.m. and took Brandon's axillary temperature, which was "low normal." She testified that his temperature was "within a normal range, but it was on the low end of normal." In response to questions by lead defense counsel on direct examination, she acknowledged that her deposition transcript indicated that she had testified that his temperature was "below normal." She testified, however, that her deposition testimony "was not typed correctly" and that she had testified at the deposition that Brandon's temperature was "low normal." She denied telling Amy that his temperature was 35 degrees Celsius.

She testified that she came back at approximately 6 p.m. and took another axillary temperature and that his temperature had gone up some but was still not where she would

10

have liked it to be. She acknowledged that she took Brandon into the nursery and asked a nursery nurse for advice. At the nursery nurse's suggestion, she took a rectal temperature, which she testified was normal. She denied that she put Brandon under a warmer, that he had an unstable temperature at 6 or 7 p.m. on the evening of his discharge, or that he had any difficulty feeding that day. She testified that Amy and Brandon were discharged from the hospital at 7 p.m. She acknowledged that she did not call Brandon's doctor about his low axillary temperatures. She testified that even if she had called his doctor, his doctor would have discharged him. She testified that, in her judgment, there was no reason to check his blood sugar because he was not sick when he was discharged.

On cross-examination, Lyles was asked whether she had been interviewed by any attorney for Memorial other than lead defense counsel. She stated that she only recalled being interviewed by lead defense counsel and that he had taken notes of the interview. At this point, the plaintiffs' counsel requested a sidebar conference, suggested that Memorial had been represented by other counsel early in the case, and requested that the court order defense counsel to produce any notes of interviews with Lyles by any attorney for Memorial. The court took the issue under advisement. In subsequent arguments, the plaintiffs' counsel argued that Lyles had changed her testimony since her deposition and that the notes could be used for impeachment. The trial court reviewed lead defense counsel's notes *in camera* and denied the plaintiffs' counsel's request for their production because the notes were not sufficiently detailed.

On further cross-examination, Lyles again testified that Brandon's axillary temperatures were "within low normal" limits. Although she acknowledged that she had testified at her deposition that she took a rectal temperature because his axillary temperatures were *not* "within normal limits," she continued to assert that her testimony was "taken out of context." She acknowledged that by "not within normal limits" she meant that the

11

temperatures were "below normal temperature," and she admitted that she did not call his doctor to tell her that his axillary temperatures were below normal limits. She also acknowledged that after taking the first axillary temperature, which was low, she told Amy to wrap him in a blanket and that after Amy had done so, she took another axillary temperature, which, according to her, was still at "the low end of normal." She testified that "the low end of normal" was around 97 degrees Fahrenheit. She acknowledged that 35 degrees Celsius was the same as 95 degrees Fahrenheit, which was very much below normal, and she again denied telling Amy that Brandon's temperature was 35 degrees Celsius. She acknowledged that after taking the second axillary temperature, which she claimed was "low normal," she told Amy to wrap another blanket around Brandon. In addition, she acknowledged that, at Scott's urging, she got a different thermometer to check Brandon's temperature in case the thermometer she was using was defective. His axillary temperature was the same with the new thermometer as it had been with the old one.

Lyles further acknowledged that, although the standard of care requires that she document the axillary temperatures in the medical chart, she had failed to do so; that she had not brought the low axillary temperatures to the doctor's attention; that, in her deposition, she had said that the axillary temperatures were "not within normal limits"; that once the environmental factors had been eliminated and the axillary temperature was still not normal, a doctor might have concluded that something was causing the axillary temperature to be below normal, and that the doctor did not have a chance to make that decision in this case because she had not informed the doctor of the below-normal axillary temperatures. She testified that, although she was aware that a low temperature is a sign of hypoglycemia, it had not occurred to her that Brandon might have hypoglycemia when his axillary temperatures were "low normal." She also admitted that she had taken Brandon into the nursery to have the nursery nurse look at him before he was discharged, but she denied that

12

a warming light was used on him before his rectal temperature was taken at 6 p.m. However, she acknowledged that, at her deposition, she had testified that she had not put him under a warming light but that she did not know whether anyone else had done so. She denied telling Amy and Scott that he had been put under a warming light.

Lyles also acknowledged that her records indicate that at 3:15 p.m., Brandon had fed well and retained what he had eaten but that at 4:45 p.m. and 5:20 p.m., she had not recorded whether he had fed well or retained what he had eaten. She also acknowledged that it was Memorial's policy that if a baby was not eating well and had a low temperature at the time of discharge, he should not be discharged.

Lyles denied receiving a phone call from Amy between 9 and 9:30 p.m. the evening Brandon was discharged, but she acknowledged that she did receive a phone call from Amy between 11 and 11:30 p.m., near the end of her shift. Amy was concerned that Brandon was sleepy and was not eating well. Lyles told her to try using a cold "wash rag" or to try stroking his head, rubbing his back, or playing with his feet to try to wake him up to feed him. Lyles asked the nursery nurse for advice, and the nursery nurse told her to tell Amy to give Brandon some formula and, if that did not work, to call the doctor. Lyles testified that she told Amy to try to give Brandon some formula and, if that did not work, to call back or call the doctor. She also told Amy that some sleepiness was normal in the first 48 hours of life. She denied that Amy told her that Brandon was lethargic or listless, that his eyes had rolled back in his head, or that he had a blank stare. She testified that if Amy had told her those things, she would have called 9-1-1 because those symptoms are not normal for a newborn. She testified that she did not tell Amy to bring Brandon to the emergency room or to call the doctor, because he had been feeding well, he was fine when he was discharged, and the things that Amy was telling her over the phone did not raise any red flags. Amy did not tell her that Brandon was not eating. She just said that he was not nursing like he had

earlier that day, which Lyles stated is normal.

Dr. Earl Smith, a specialist in emergency medicine, opined that Dr. Conard met the standard of care in treating Brandon, that an emergency room doctor was not required to have attempted an umbilical cord cutdown procedure or an interosseous infusion in order to meet the standard of care, and that the administration of oral glucose met the standard of care and was effective in stabilizing and reversing the hypoglycemia. He testified that Brandon was hypoglycemic in the emergency room for only 35 or 40 minutes, that no medical evidence demonstrated that such a duration of hypoglycemia would have caused Brandon's injury, and that he did not believe that Brandon had sustained any brain injury while in the emergency room.

Scott DeBoer, a specialist in emergency room and critical care nursing, testified that Lyles properly relied on Brandon's rectal temperature in assessing his status before discharge; that Brandon's symptoms before discharge did not include the typical signs of hypoglycemia, such as irritability, jitteriness, temperature instability, and seizures; that Lyles properly allowed Brandon to be discharged without calling his doctor; and that the standard of care did not require that a blood-sugar check be done before discharging Brandon.

On cross-examination, DeBoer acknowledged that if Brandon had a low axillary temperature and poor feeding, two possible signs of hypoglycemia, Lyles deviated from the standard of care in not calling his doctor before discharging him. He also acknowledged that, if Amy's testimony were true, Lyles deviated from the standard of care in failing to tell Amy to bring Brandon back to the hospital or to call his doctor when Amy called her later in the evening after he was discharged. He also acknowledged that if Amy's testimony were true, the nursery nurse with whom Amy spoke by telephone at 5 a.m. the following morning deviated from the standard of care in failing to tell Amy to bring Brandon to the emergency room. On recross-examination, DeBoer acknowledged that Lyles deviated from the standard

14

of care in not calling Brandon's doctor before discharging him because he had a low axillary temperature and poor feeding, which are two possible signs of hypoglycemia.

Dr. Dennis Matthews, a pediatric-rehabilitation-medicine specialist, testified that Brandon has a reduced life expectancy because he will not be able to maintain cardiovascular fitness as a result of his lack of mobility and exercise. He opined that Brandon would live into his late 50s or early 60s. Lori Beth Elliot, a nurse and life-care-planning specialist, opined that the costs of Brandon's lifetime care would be reduced because of his reduced life expectancy and that the costs of his lifetime care would be $2.5 million. Thomas Ireland, an economist, explained how and why he used different discount rates and a different work life than those used by Professor Grossman.

The videotaped evidence deposition of Dr. Jane McGowan, who is certified in pediatrics and has a subspecialty certification in neonatal/perinatal medicine, was played for the jury. Dr. McGowan opined that the defendants met the standard of care in their treatment of Brandon during his hospitalization from his birth through his discharge, that the defendants met the standard of care in handling Amy's phone calls after discharge, that the defendants met the standard of care in the emergency room, and that there was no way to determine whether an earlier intervention would have changed the outcome. On cross-examination, however, Dr. McGowan acknowledged that, if Amy's testimony were true, Memorial's nurses deviated from the standard of care in responding to Amy's telephone calls to the hospital on the evening after discharge and the following morning.

Dr. Craig Alter, a specialist in pediatric endocrinology, testified that more than half of the children diagnosed with and treated for hyperinsulinism during the first week of life had serious neurological problems. He opined that Dr. Conard met the standard of care in her treatment of Brandon in the emergency room and did not cause any brain damage to him. He also opined that Lyles met the standard of care in allowing Brandon to be discharged

15

sometime between 7 and 8:30 p.m. without calling his doctor even though he had low axillary temperatures followed by a normal rectal temperature and had not fed well since the 3:15 p.m. feeding. On cross-examination, however, Dr. Alter acknowledged that if, as Amy claimed, Brandon had a low temperature and had not fed at all since the 3:15 p.m. feeding, Lyles deviated from the standard of care in not calling his doctor before discharging him.

After the defense rested, the plaintiffs' attorney called the defendants' lead trial attorney as a rebuttal witness. The defendants' attorney requested a sidebar. The trial judge asked the plaintiffs' attorney why he wanted to call the defendants' attorney as a witness, and the plaintiffs' attorney responded, "I'll tell you *in camera*, but he's my witness[;] I'm going to examine him on a point." The trial judge then stated, "Well, then you and I will have to go talk." At that point, the plaintiffs' attorney and the trial judge exited the courtroom and had an *ex parte* discussion off the record. Defense counsel, in arguments on posttrial motions, described this discussion as lasting "a couple of minutes." When they returned, the trial judge stated: "Swear [the defendants' attorney] in. There's [*sic*] two areas of inquiry." The defendants' attorney objected, arguing that it was "inappropriate" to call an attorney as a witness. The plaintiffs' attorney responded that he was calling the defendants' attorney as a fact witness, not as an attorney. The trial judge responded, "On these two issues, I've approved."

The defendants' attorney acknowledged in his testimony that at the conclusion of Lyles' deposition in 2002 he had instructed Lyles to reserve the right to read the deposition before signing it; that the court reporter had mailed him a copy of Lyles' deposition, along with a proposed signature page requesting that Lyles read the deposition and note any corrections; that he had instructed Lyles to read the deposition and note any corrections on a separate sheet of paper; that Lyles had returned the signed signature page with no corrections; and that he had mailed the signed signature page to the court reporter with a

16

cover letter stating that there were no corrections to Lyles' deposition. When he was asked whether Lyles "was in error" when she testified that he was the only attorney to whom she had spoken, he acknowledged that he thought that Lyles had been interviewed by other attorneys who had handled the case before his law firm.

The jury found in favor of Dr. Conard and her employer, Belleville Emergency Physicians, but against Memorial. The jury awarded Brandon $6.1 million in damages, including $475,000 for disfigurement, $475,000 for the loss of a normal life, $475,000 for pain and suffering, $1.6 million for lost earnings, $2.6 million for future caretaking and medical expenses, and $475,000 for the value of a decreased life expectancy. The jury also awarded Brandon's parents $1.5 million in damages, including $1,239,792 for past and future special parental help and $260,208 for past medical expenses. Because the jury also found that Brandon's parents contributed 30% to his injuries, their verdict was reduced to $1.05 million.

Memorial filed a posttrial motion. Following a hearing, the trial court granted Memorial's request to offset the verdict by the amount recovered from the settling codefendants, but it denied Memorial's motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial or for remittitur. Memorial filed a timely notice of appeal.

ANALYSIS

Memorial's first argument on appeal is that the trial judge erred in allowing the plaintiffs' attorney to call the defendants' attorney as a fact witness on issues touching upon the credibility of his client and in conducting an *ex parte* communication with the plaintiffs' attorney about the propriety of allowing that testimony. The plaintiffs argue that Memorial has waived its claim that the trial judge erred in conducting the *ex parte* communication by failing to object at the trial. "It is well established that both an objection at trial and a written

17

post[]trial motion raising the issue are necessary to preserve an alleged error for review." *People v. Williams*, 173 Ill. 2d 48, 85, 670 N.E.2d 638, 656 (1996). "Application of the waiver rule, however, is less rigid where the basis for the objection is the trial judge's conduct." *Williams*, 173 Ill. 2d at 85, 670 N.E.2d at 656. Accordingly, we will address Memorial's claim of alleged judicial impropriety.

Canon 3 of the Code of Judicial Conduct provides, in pertinent part:

"A. Adjudicative Responsibilities.

\* \* \*

(4) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider *ex parte* communications[] or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding[,] except that:

(a) Where circumstances require, *ex parte* communications for scheduling, administrative purposes[,] or emergencies that do not deal with substantive matters or issues on the merits are authorized[,] provided:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the *ex parte* communication, and

(ii) the judge makes provision promptly to notify all other parties of the substance of the *ex parte* communication and allows an opportunity to respond." 188 Ill. 2d R. 63(A)(4)(a).

The *ex parte* communication in the present case was improper because it was not for scheduling, administrative purposes, or emergencies that did not deal with substantive

18

matters or issues on the merits; the judge could not have reasonably believed that no party would gain a procedural or tactical advantage as a result of the *ex parte* communication; and the judge did not promptly notify the other parties of the substance of the *ex parte* communication and allow them an opportunity to respond. See 188 Ill. 2d R. 63(A)(4)(a).

Relying on *People v. Bradshaw*, 171 Ill. App. 3d 971, 525 N.E.2d 1098 (1988), and *In re Marriage of Wheatley*, 297 Ill. App. 3d 854, 697 N.E.2d 938 (1998), Memorial argues that the improper *ex parte* communication created an appearance of impropriety, which requires a reversal for a new trial. In *Bradshaw*, the trial judge was seen receiving a note from a deputy sheriff, who was the mother of the victim in the case. *Bradshaw*, 171 Ill. App. 3d at 976, 525 N.E.2d at 1101. The judge then immediately recessed court and entered into his chambers with the deputy. *Bradshaw*, 171 Ill. App. 3d at 976, 525 N.E.2d at 1101. Although the trial judge claimed that he ended the conversation when he learned the deputy's relationship to the case, the reviewing court held that an appearance of impropriety had been created and that the trial judge had a duty to recuse himself. *Bradshaw*, 171 Ill. App. 3d at 976, 525 N.E.2d at 1101. Similarly, in *In re Marriage of Wheatley*, this court held that an appearance of impropriety had been created where the trial judge received an improper *ex parte* communication that was designed and intended to influence his decision even though the trial judge claimed that he did not read the letter, that he was unaware of its contents, and that it did not influence his decision. *In re Marriage of Wheatley*, 297 Ill. App. 3d at 858, 697 N.E.2d at 941.

In the present case, unlike in *Bradshaw* and *In re Marriage of Wheatley*, it was no secret that an *ex parte* communication occurred, nor was the subject of the *ex parte* communication a secret. Instead, the *ex parte* communication occurred during the trial, and all the parties and their attorneys were aware that it was occurring and that its purpose was to allow the plaintiffs' attorney to tell the trial judge why he wanted to call the defendants'

attorney as a rebuttal witness without letting the defendants' attorney know what he wanted to ask him. In addition, after the *ex parte* communication, the trial judge indicated to the parties, the parties' attorneys, and the jury that he was allowing the plaintiffs' attorney to call the defendants' attorney as a rebuttal witness on two issues. In the present case, unlike in *Bradshaw* and *In re Marriage of Wheatley*, a reversal is unnecessary because there is no suggestion of bias or prejudice on the part of the trial judge, *i.e.*, there is no suggestion that there was any outside influence or that the case was decided on any basis other than the evidence presented in the case. Accordingly, there was no appearance of impropriety. We therefore conclude that, under the circumstances of this case, any error committed by the trial court by conducting this brief *ex parte* communication was harmless.

We turn then to Memorial's argument that the trial court abused its discretion in allowing the plaintiffs' attorney to call the defendants' attorney as a fact witness on issues touching upon the credibility of Lyles, Memorial's only other fact witness. The decision to admit evidence is within the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1074, 866 N.E.2d 663, 676 (2007). An abuse of discretion may be found where no reasonable person would take the view adopted by the trial court. *Jackson*, 372 Ill. App. 3d at 1074, 866 N.E.2d at 676.

The advocate-witness rule precludes an attorney from acting as an advocate and a witness in the same case. See 134 Ill. 2d Rs. 3.3(a)(10), 3.7; *People v. Blue*, 189 Ill. 2d 99, 136, 724 N.E.2d 920, 940 (2000). However, the advocate-witness rule is not absolute. *People v. Gully*, 243 Ill. App. 3d 853, 859, 611 N.E.2d 1374, 1378 (1993). An attorney may testify in a case in which he is engaged if, in the trial court's discretion, that testimony is necessary. *Gully*, 243 Ill. App. 3d at 859, 611 N.E.2d at 1378.

It is important to recognize the circumstances under which the plaintiffs were allowed to call defense counsel to testify in rebuttal. Defense counsel, in apparent anticipation of

20

Lyles' impeachment by a prior inconsistent statement, initiated direct examination testimony in which Lyles claimed that the court reporter had failed to accurately report critical testimony in her discovery deposition. A careful review of this line of questioning leaves little doubt that it was discussed by defense counsel and Lyles prior to the trial. Lyles persisted in this claim during cross-examination. The plaintiffs' counsel later discovered, in a review of his file, that the same defense counsel who had initiated Lyles' testimony on this issue had conferred with Lyles shortly after her deposition had been taken and had notified the court reporter, in writing, that Lyles had reviewed her deposition and requested no corrections. It is within this context that the trial court allowed defense counsel to be called, in brief rebuttal, so that the letter from the court reporter, the signed deposition signature page, and defense counsel's letter to the court reporter could be admitted into evidence.

We believe that the testimony of defense counsel was reasonably necessary and was invited by his own conduct. Although defense counsel represented Memorial, not Lyles, he chose to act as an intermediary between Lyles and the court reporter to determine whether Lyles had any corrections to her deposition. In doing so, he became the only witness who could conclusively state that Lyles had reviewed her deposition and reported to him that she had no corrections. When he then placed her on the witness stand to testify that her deposition was inaccurately reported, he ran the risk of being called as a witness to contradict that testimony. Under the peculiar circumstances of this case, we do not believe that the trial court abused its discretion in allowing defense counsel to be called as a rebuttal witness to elicit this testimony.

The defendants' attorney also testified that Lyles was "in error" when she testified at the trial that he was the only attorney to whom she had spoken. This testimony was related to the plaintiffs' counsel's earlier request for notes taken by Memorial's attorneys who had interviewed Lyles. The plaintiffs' counsel pursued the notes in an effort to discredit Lyles'

21

claim that her deposition testimony was inaccurately reported. Thus, this line of questioning was related to the issue of the accuracy of Lyles' deposition testimony. On this issue, Memorial's prior counsel could have been called, and the necessity of eliciting this testimony from defense counsel is in question. See, *e.g.*, *People v. Wilson*, 271 Ill. App. 3d 943, 946, 649 N.E.2d 1377, 1380 (1995) (the trial court did not abuse its discretion in refusing to permit an attorney to testify particularly where another witness was available to testify). Nevertheless, we believe any error in allowing this line of questioning was harmless because Memorial has failed to demonstrate any actual prejudice resulting from the error. See *Gully*, 243 Ill. App. 3d at 864, 611 N.E.2d at 1382 ("Assuming, *arguendo*, the prosecutor violated the advocate-witness rule, we believe any error was harmless").

Memorial next argues that the trial court abused its discretion in allowing the plaintiffs' expert witnesses to express undisclosed opinions and in allowing the plaintiffs to introduce additional undisclosed material through medical texts in violation of Illinois Supreme Court Rule 213 (210 Ill. 2d R. 213). The admission of evidence pursuant to Rule 213 is within the trial court's discretion and will not be disturbed on appeal absent an abuse of that discretion. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109, 806 N.E.2d 645, 651 (2004). In addition, the party challenging the admission of opinion testimony as a violation of Rule 213 must show some prejudice arising from the alleged error. *Hendrix v. Stepanek*, 331 Ill. App. 3d 206, 214, 771 N.E.2d 559, 566 (2002). Absent a showing of prejudice, the judgment need not be reversed on appeal. *Hendrix*, 331 Ill. App. 3d at 214, 771 N.E.2d at 566. Where the undisclosed testimony is cumulative of other testimony, the opposing party is not prejudiced by its admission and a new trial is not warranted. See, *e.g.*, *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 316-19, 614 N.E.2d 1194, 1199-1201 (1993) (the court did not abuse its discretion in admitting undisclosed testimony that was cumulative of other testimony because the defendant was not prejudiced by its admission).

22

With these principles in mind, and after thoroughly reviewing the record on appeal, including the plaintiffs' Rule 213 disclosures, the deposition testimony, the trial testimony, and the defendants' objections thereto, we have carefully considered each of Memorial's Rule 213 arguments on appeal. Although, in the interest of brevity, we will not address each of those arguments individually in this opinion, we find that all the complained-of expert testimony was either disclosed (in the plaintiffs' Rule 213 disclosures, the experts' medical records, or the experts' depositions) or cumulative of the properly admitted testimony of other expert witnesses, including the defendants' own experts (usually on cross-examination). Accordingly, we find no reversible error based on the plaintiffs' alleged Rule 213 violations. See *Boatmen's National Bank of Belleville*, 155 Ill. 2d at 316-19, 614 N.E.2d at 1199-1201.

Memorial next argues that the trial court improperly restricted the scope of the defendants' cross-examination of Dr. Goetting regarding his disclosed opinion that Children's Hospital deviated from the standard of care. The scope of cross-examination is within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion resulting in manifest prejudice. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 533, 736 N.E.2d 1074, 1090 (2000). The scope of cross-examination is generally limited to the subject matter of direct examination and to matters that affect the witness's credibility. *People v. Lewis*, 223 Ill. 2d 393, 404, 860 N.E.2d 299, 306 (2006).

On direct examination, Dr. Goetting was asked no questions and offered no opinion on the issue of whether Children's Hospital contributed to cause Brandon's brain damage. In addition, Dr. Goetting's testimony on direct examination did not contradict his disclosures. Both in his disclosures and in Memorial's offer of proof, he opined that Children's Hospital's deviation from the standard of care *contributed to* Brandon's brain damage, not that it was the *sole* proximate cause of the brain damage. Therefore, the questions on cross-examination concerning his disclosed opinions with regard to Children's Hospital were outside the scope

23

of direct examination and did not affect his credibility. Accordingly, the trial court did not abuse its discretion in refusing to allow the defendants to elicit that testimony on cross-examination.

Memorial relies upon *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 658 N.E.2d 450 (1995), and *Simmons v. Garces*, 198 Ill. 2d 541, 763 N.E.2d 720 (2002), to support its argument that it should have been allowed to elicit testimony regarding the fault of the settling defendants. In *Leonardi*, the Illinois Supreme Court found that the remaining defendants were properly allowed to present evidence that a deceased physician, whose estate had settled with the plaintiffs before the trial, was *solely* liable for the decedent's harm. *Leonardi*, 168 Ill. 2d at 91-95, 658 N.E.2d at 454-56. *Simmons* stands for the proposition that a defendant is always free to offer evidence that a third person's conduct was the *sole* proximate cause of the plaintiff's injuries. *Simmons*, 198 Ill. 2d at 572-73, 763 N.E.2d at 740. *Leonardi* and *Simmons* are inapplicable here because Memorial offered no evidence that the conduct of the settling defendants was the *sole* proximate cause of Brandon's injuries.

Memorial next argues that the trial court erred in giving, over its objection, a missing-witness instruction, Illinois Pattern Jury Instructions, Civil, No. 5.01 (2005) (hereinafter IPI Civil (2005)). The missing-witness instruction allows a jury to draw an adverse inference from a party's failure to produce a witness. IPI Civil (2005) No. 5.01. "In general, the missing-witness instruction is available when[] (1) the missing witness was under the control of the party to be charged and could have been produced by reasonable diligence; (2) the witness was not equally available to the opposing party; (3) a reasonably prudent person would have produced the witness if he believed that the testimony would be favorable; and (4) there is no reasonable excuse shown for the failure to produce the witness." *Taylor v. Kohli*, 162 Ill. 2d 91, 97, 642 N.E.2d 467, 469 (1994). However, the missing-witness

24

instruction is not warranted if the unproduced witness's testimony would be merely cumulative of facts already established. *Montgomery v. Blas*, 359 Ill. App. 3d 83, 86, 833 N.E.2d 931, 934 (2005). The decision whether to give the missing-witness instruction is within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion. *Simmons v. University of Chicago Hospitals & Clinics*, 162 Ill. 2d 1, 7, 642 N.E.2d 107, 110 (1994).

In the present case, the defendants disclosed six nurses as witnesses having knowledge of the facts and circumstances relating to Brandon's care, and the court read their names to the jury during *voir dire*. However, none of the six nurses testified on Memorial's behalf.

At the instruction conference, the trial court recognized that there were at least three nurse-employee witnesses who were under Memorial's control and had knowledge of relevant facts: (1) the nursery nurse to whom Lyles took Brandon to get her opinion regarding his low axillary temperatures before discharging him, (2) the nursery nurse to whom Lyles spoke about the advice she should give Amy when Amy called her after she and Brandon had been discharged, and (3) the nursery nurse with whom Amy spoke by telephone at approximately 5 a.m. the morning after she and Brandon had been discharged. Defense counsel advised the court that the defendants could not identify the nurses.

The nurses were employees of Memorial. Accordingly, they were under Memorial's control, they could have been produced with the exercise of due diligence, and they were not equally available to the plaintiffs. See *Taylor*, 162 Ill. 2d at 97, 642 N.E.2d at 469; *Simmons*, 162 Ill. 2d at 7, 642 N.E.2d at 110; IPI Civil (2005) No. 5.01, Comment at 33 ("A witness is not 'equally available' to a party if there is a likelihood that the witness would be biased against him, as for example *** an employee of the other party"). In addition, a reasonably prudent person would have produced the nurses if he believed their testimony would be favorable. See *Taylor*, 162 Ill. 2d at 97, 642 N.E.2d at 469. The testimony about Brandon's

25

temperature instability prior to his discharge and Amy's telephone calls back to the nurses at Memorial after discharge was critical in this case, which turned on the relative credibility of Lyles and Amy. Accordingly, the nurses' testimony would not have been merely cumulative of facts already established. See *Montgomery*, 359 Ill. App. 3d at 86, 833 N.E.2d at 934. Finally, there was no reasonable excuse for Memorial's failure to produce the nurses. See *Taylor*, 162 Ill. 2d at 97, 642 N.E.2d at 469. Memorial's claim that the nurses could not be identified was not a reasonable excuse under the circumstances in the present case. Lyles should have been able to identify the nursery nurse to whom she had taken Brandon for advice before discharging him, as well as the nursery nurse to whom she had gone for advice when Amy called her later that evening. In addition, even without Lyles' help, Memorial should have been able to identify what nursery nurses were on duty that evening and, with reasonable diligence, should have been able to determine which nurse or nurses had given Lyles advice regarding Brandon's care. Similarly, Memorial should have been able to identify what nursery nurses were on duty at 5 a.m. the following morning when Amy called the nursery and, with reasonable diligence, should have been able to determine which nurse had taken Amy's call. Accordingly, the trial court did not abuse its discretion in giving the missing-witness instruction.

Memorial next argues that the trial court erred in giving, over its objection, an improper nonpattern jury instruction allowing Brandon to recover damages for "an increased risk of a decreased life expectancy as a result of the defendants' negligence." "In Illinois, the parties are entitled to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proved to support its verdict." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505, 771 N.E.2d 357, 371 (2002). "The decision to give or deny an instruction is within the trial court's discretion." *Dillon*, 199 Ill. 2d at 505, 771 N.E.2d at 371. "The standard for determining an abuse of discretion is whether, taken as a whole,

26

the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." *Dillon*, 199 Ill. 2d at 505, 771 N.E.2d at 371. To justify an instruction, there must be some evidence in the record to support the theory. *Jackson*, 372 Ill. App. 3d at 1075, 866 N.E.2d at 677.

Over the defendants' objections, the court gave several instructions on the issue of decreased life expectancy. The first instruction allowed the jury to award Brandon damages for "[t]he increased risk of future loss of life expectancy or harm resulting from the injuries." This instruction was IPI Civil (2005) No. 30.04.03, with "loss of life expectancy or harm" inserted in the blank space for the "specific condition." This instruction is to be given in a case where the damages claimed are within the scope of the ruling in *Dillon*, 199 Ill. 2d 483, 771 N.E.2d 357. IPI Civil (2005) No. 30.04.03, Notes on Use. When this instruction is given, IPI Civil (2005) No. 30.04.04 must also be used. IPI Civil (2005) No. 30.04.03, Notes on Use.

In the present case, the court also gave IPI Civil (2005) No. 30.04.04, with the words "loss of life expectancy and harm," "a shortened life expectancy," and "the shortened life expectancy" inserted in the blanks for the "specific condition." That instruction stated:

"To compute damages for increased risk of future loss of life expectancy and harm only, you must multiply the total compensation to which the plaintiff, Brandon Bauer, would be entitled if a shortened life expectancy were certain to occur by the proven probability that the shortened life expectancy will in fact occur."

The court also gave the following instruction:

"The plaintiff Brandon Bauer claims that he has suffered an increased risk of a decreased life expectancy as a result of the defendants' negligence. The plaintiff is entitled to recover damages for harm resulting from a failure to exercise reasonable care. If the failure to exercise reasonable care increases the risk that such harm will

27

occur in the future, the plaintiff is entitled to compensation for the increased risk. In order to award this element of damages, you must find a breach of duty that was a substantial factor in causing a present injury which has resulted in an increased risk of future harm. The increased risk must have a basis in the evidence. Your verdict must not be based on speculation. The plaintiff is entitled to compensation to the extent that the future harm is likely to occur as measured by multiplying the total compensation to which the plaintiff would be entitled if the harm in question were certain to occur by the proven probability that the harm in question will in fact occur."

Although this is a nonpattern instruction, it was taken almost verbatim from *Dillon*, in which the Illinois Supreme Court quoted it with approval and held that it "fairly and correctly states the law on this element of damages." *Dillon*, 199 Ill. 2d at 506-07, 771 N.E.2d at 371-72.

Memorial argues that the award of damages for the value of a decreased life expectancy is not authorized by *Dillon*. We disagree. In *Dillon*, 199 Ill. 2d at 500, 771 N.E.2d at 368, the Illinois Supreme Court quoted with approval the following statement from Judge Posner's dissent in *DePass v. United States*, 721 F.2d 203, 208 (7th Cir. 1983) (Posner, J., dissenting): "A tortfeasor should not get off scot-free because instead of killing his victim outright he inflicts an injury that is likely though not certain to shorten the victim's life." The *Dillon* court also quoted with approval the following statement from *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997):

"There is nothing novel about requiring health care professionals to compensate patients who are negligently injured while in their care. To the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Holton*, 176 Ill. 2d at 119, 679 N.E.2d at 1213.

28

The *Dillon* court then stated its holding as follows:

> "[W]e hold simply that a plaintiff must be permitted to recover for *all* demonstrated injuries. The burden is on the plaintiff to prove that the defendant's negligence increased the plaintiff's risk of future injuries. A plaintiff can obtain compensation for a future injury that is not reasonably certain to occur, but the compensation would reflect the low probability of occurrence." (Emphasis in original.) *Dillon*, 199 Ill. 2d at 504, 771 N.E.2d at 370.

In the present case, Dr. Matthews, one of the defendants' experts, opined that Brandon had a decreased life expectancy because of his inability to maintain cardiovascular fitness as a result of his lack of mobility and exercise, which were a result of his brain injuries. Dr. Matthews opined that Brandon would live into his late 50s or early 60s. The defendants' life-care planner submitted a life-care plan based upon life expectancies of 64, 60, and 57, in contrast to the 75-year life expectancy the plaintiffs used to calculate Brandon's future care costs. By introducing evidence of Brandon's decreased life expectancy, the defendants hoped that the jury would award at least $1 million less for the cost of his future care.

The parties have not cited, nor have we found, any Illinois case law that explicitly governs whether a plaintiff can recover damages for decreased life expectancy in a non-wrongful-death case. However, many jurisdictions have recognized decreased life expectancy as a cognizable injury in a personal injury action. See, *e.g.*, *Straus v. McDonald*, 67 Va. Cir. 116 (2005) (holding that damages for a decreased life expectancy are proper in a non-wrongful-death medical malpractice action where the patient can prove that a worsened condition and a probability of earlier death are results of the doctor's negligence); *Alexander v. Scheid*, 726 N.E.2d 272, 281 (Ind. 2000) (holding that a plaintiff may maintain a medical malpractice action against a doctor who failed to diagnose cancer for "increased risk of harm, which may be described as a decreased life expectancy or the diminished

probability of long-term survival"); *Davison v. Rini*, 115 Ohio App. 3d 688, 697, 686 N.E.2d 278, 284 (1996) (holding "that a shortened life expectancy is a cognizable injury"); *United States v. Anderson*, 669 A.2d 73, 78 (Del. 1995) (permitting a recovery for a shortened life expectancy due to an increased risk of a recurrence of cancer); *Swain v. Curry*, 595 So. 2d 168, 172-73 (Fla. App. 1992) (permitting a recovery for an increased risk of cancer, a decreased chance of survival, and a reduction of life expectancy allegedly caused by a doctor's failure to timely diagnose cancer); *Knopfer v. Louisiana Patient's Compensation Fund*, 527 So. 2d 326, 329 (La. App. 1988) (holding that a reduction in life expectancy due to a misdiagnosis of moles as benign justified a $500,000 award); *Morrison v. Stallworth*, 73 N.C. App. 196, 205, 326 S.E.2d 387, 393 (1985) (holding "that shortened life expectancy is a compensable element of damage"); *McNeill v. United States*, 519 F. Supp. 283, 289 (D.S.C. 1981) (predicting that under South Carolina law "[t]he deprivation of a normal life expectancy is a necessary and proper element of damages").

Those cases recognize a decreased life expectancy as an independent element of damages in a personal injury action, entitling a plaintiff to compensation for the years of expected life lost due to a defendant's negligence. As the court explained in *Alexander*:

"We view the issue *** as whether a plaintiff may recover for an increased risk of harm, here a decreased life expectancy, caused by a doctor's negligence, before the ultimate consequences are known. Because *** the ultimate injury is death, the increased risk of that result is a decrease in life expectancy. Although loss of chance could also be applied as a label for this injury, we do not view recognizing this injury as a deviation from traditional tort principles. Rather, *** it is nothing more than valuation of an item of damages that is routinely valued in other contexts." *Alexander*, 726 N.E.2d at 279-80.

As the *Alexander* court also explained:

"Money is an inadequate substitute for a period of life, but it is the best a legal system can do. The alternative is to let a very real and very serious injury go uncompensated even if due to negligent treatment. Faced with that choice, we hold that [the plaintiff] has stated a viable cause of action ***. *** [W]e hold that [the plaintiff] may maintain a cause of action in negligence for this increased risk of harm, which may be described as a decreased life expectancy or the diminished probability of long-term survival." *Alexander*, 726 N.E.2d at 281.

We find the reasoning of *Alexander* and the other cases cited above persuasive. It is logical to recognize, as those courts do, that life itself has value and that a defendant should be required to pay damages for wrongful conduct that reduces a plaintiff's life expectancy. A defendant should not be allowed to benefit from a reduction in a plaintiff's damages due to a decreased life expectancy when it was the defendant's wrongful conduct that caused the decreased life expectancy. Accordingly, we hold that damages for a decreased life expectancy are proper where a plaintiff can prove that his life expectancy is decreased as a result of the defendant's negligence.

In the present case, there was sufficient evidence that Brandon's life expectancy was decreased as a result of Memorial's negligence to justify the instructions. See *Jackson*, 372 Ill. App. 3d at 1075, 866 N.E.2d at 677. In addition, the instructions were sufficiently clear so as not to mislead, and they fairly and correctly stated the law. See *Dillon*, 199 Ill. 2d at 505, 771 N.E.2d at 371. Accordingly, the trial court did not abuse its discretion in giving the instructions. See *Dillon*, 199 Ill. 2d at 505, 771 N.E.2d at 371.

Memorial next argues that the trial court erred in permitting the jury to consider damages for the special parental help Brandon's parents have given him in the past and will give him in the future. Memorial argues that Illinois does not recognize this as an element of damages for parents arising from an injury to their child. We disagree.

31

In *Worley v. Barger*, 347 Ill. App. 3d 492, 498, 807 N.E.2d 1222, 1227 (2004), this court held that a parent who cared for her child who was injured as a result of a defendant's negligence could recover the reasonable value of caretaking services that would have been allowed if someone had been hired to care for her child. In so holding, this court reasoned:

"We find that it is reasonably foreseeable that an injury to a minor child would result in his or her parent expending time in caring for the child and that there is a sufficient likelihood of the parent suffering pecuniary injury. The magnitude of guarding against the injury is no greater than that of guarding against the injury to the child. The consequence of placing the burden on the defendant to pay the reasonable value of the services rendered to the minor child by the parent is no greater than if the expense had been incurred in employing a third person to deliver the service." *Worley*, 347 Ill. App. 3d at 498, 807 N.E.2d at 1227.

Memorial also argues that the plaintiffs did not request that the special-parental-help damages be reduced to present cash value. This argument is without merit. The trial court instructed the jury on how to reduce those damages to "present cash value."

Memorial also argues that, although the plaintiffs crafted the instruction with the language "special parental help," they were seeking damages for the loss of society between a parent and a child and the disruption of the family relationship as a result of the child's injury and were making an "end run" around the Illinois Supreme Court's rulings in *Dralle v. Ruder*, 124 Ill. 2d 61, 529 N.E.2d 209 (1988) (holding that a parent does not have a cause of action for the loss of a child's society resulting from a negligently caused nonfatal injury to the child), and *Vitro v. Mihelcic*, 209 Ill. 2d 76, 806 N.E.2d 632 (2004) (same). This argument is without merit. The plaintiffs did not seek damages for a loss of society; nor was such a claim submitted to the jury.

Memorial also argues that the special-parental-help damages are duplicative of

Brandon's award to the extent they relate to extra caretaking expenses and services. Again, this argument is without merit. In a case as tragic as this one, it is easy to understand the special assistance that Brandon needs from his parents. This special assistance is distinct from the caretaking and medical expenses provided by medical and other trained personnel. Brandon's parents' claim was for the special assistance that Brandon needs from *them*, exclusive of those caretaking expenses recovered in Brandon's claim. Accordingly, the jury was properly instructed on special-parental-help damages.

Memorial next argues that the trial court erred in instructing the jury on Brandon's future caretaking and medical expenses because they are his parents' damages, not his. It is well established in Illinois that, pursuant to section 15(a)(1) of the Rights of Married Persons Act (750 ILCS 65/15(a)(1) (West 2006)), commonly referred to as "the family expense statute," parents are responsible for the medical expenses of their minor children. *Graul v. Adrian*, 32 Ill. 2d 345, 347, 205 N.E.2d 444, 446 (1965). The common law in turn gives parents a cause of action against a tortfeasor who, by injuring their child, caused them to incur the medical expenses. *Phillips v. Dodds*, 371 Ill. App. 3d 549, 554, 867 N.E.2d 1122, 1126 (2007). Any cause of action to recover the medical expenses is that of the parents, and if the parents are not entitled to recover, neither is the child. *Roberts v. Sisters of Saint Francis Health Services, Inc.*, 198 Ill. App. 3d 891, 904, 556 N.E.2d 662, 671 (1990). Although the parents may assign their cause of action for medical expenses to their child, the child must prove that his parents had a cause of action, and the child is subject to any defenses that could have been raised against his parents. *Roberts*, 198 Ill. App. 3d at 904, 556 N.E.2d at 671. Contributory negligence is one such defense. *Roberts*, 198 Ill. App. 3d at 904, 556 N.E.2d at 671. Accordingly, in the present case, Brandon's future caretaking and medical expenses during his minority are his parents' responsibility, and his damages award for those expenses must be reduced by 30% for his parents' contributory negligence.

33

Memorial also argues that, because of his injuries, it is undisputed that Brandon will never be emancipated, that his parents will be obligated to support him (and pay his future caretaking and medical expenses) even after he reaches majority, and that all of his future caretaking and medical expenses belong to his parents and not to him. We disagree. As this court concluded in *Ragan v. Protko*, 66 Ill. App. 3d 257, 383 N.E.2d 745 (1978):

"[I]n order for a parent to recover for his child's medical *** expenses, he must be legally liable for the charges, and the basis for such liability must exist prior to the creation of the charges and not arise due to a voluntary assumption of financial responsibility after the fact. Practically speaking once a child has reached majority, his parents are no longer legally liable for his medical bills [citations] ***." *Ragan*, 66 Ill. App. 3d at 261, 383 N.E.2d at 748.

Section 513 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/513 (West 2006)) codifies previous Illinois common law recognizing that the trial court may order a parent to pay child support after the child attains majority when the child is mentally or physically disabled. *In re Marriage of Kennedy*, 170 Ill. App. 3d 726, 732, 525 N.E.2d 168, 171 (1988). However, in doing so, the court must consider all the relevant factors, including the financial resources of the parents and the child. 750 ILCS 5/513(b) (West 2006). In *In re Marriage of Kennedy*, this court held that a parent was obligated to support a mentally disabled adult child who was unable to support himself as a result of a severe learning disability and a behavioral disorder. *In re Marriage of Kennedy*, 170 Ill. App. 3d at 732-33, 525 N.E.2d at 171-72.

In the present case, unlike in *In re Marriage of Kennedy*, Brandon will have the financial resources to support himself. His parents' obligation to support him after he attains majority will not come into play where, as here, his injury was caused by the negligence of solvent third parties, and the tort system has worked as it should. The defendants are

responsible for the costs of Brandon's postmajority caretaking and medical expenses, which were caused by their negligence. Having been found negligent, Memorial can be expected to pay the damages assessed against it for those postmajority future caretaking and medical expenses. When Brandon collects these damages, in addition to the amount he has already received from the settling codefendants, there is no reason to believe that he will be dependent upon his parents for these expenses after he attains majority. Accordingly, the cause of action for these postmajority damages belongs to Brandon, and the damages awarded for these expenses should not be reduced by 30% for his parents' contributory negligence.

Memorial next argues that the cumulative effect of the trial court's errors deprived it of a fair trial. We disagree. To the extent that errors were made, they were not sufficient, singly or considered as a whole, to warrant setting aside the jury's verdict. That verdict was fully supported by the evidence and was not the product of passion or prejudice.

Finally, Memorial argues, alternatively, that this court should grant a remittitur to correct improper and duplicative damage awards and to properly reflect a setoff for the parents' contributory negligence. " 'The practice of entering or ordering a remittitur has long been an accepted practice in Illinois and it has been consistently acknowledged to be promotive of both the administration of justice and putting an end to litigation.' " *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 253, 856 N.E.2d 389, 409 (2006) (quoting *McElroy v. Patton*, 130 Ill. App. 2d 872, 877, 265 N.E.2d 397, 400 (1970)). As the Illinois Supreme Court stated in *Tri-G, Inc.*:

> "The applicable principles are widely recognized. A remittitur is an agreement by the plaintiff to relinquish, or remit, to the defendant that portion of the jury's verdict which constitutes excessive damages and to accept the sum which has been judicially determined to be properly recoverable damages. It is a judicial

determination of recoverable damages and should not be construed as an agreement between the parties or a concession by the plaintiff that the damages were excessive. [Citations.]

Although a trial court may refuse to enter judgment on a verdict unless a portion of the verdict is remitted, the court does not have the authority to reduce the damages by entry of a remittitur if the plaintiff objects or does not consent. The trial court must afford the plaintiff the choice of agreeing or refusing to the entry of a remittitur, with the proviso that the plaintiff's refusal to agree to the entry of a remittitur will result in the ordering of a new trial. The only alternative to a remittitur in a case where the verdict exceeds the damages properly proven *** is for the trial judge to order a new trial." *Tri-G, Inc.*, 222 Ill. 2d at 253-54, 856 N.E.2d at 409-10. The standard of review in deciding whether the trial court erred in denying the defendant's motion for a remittitur is whether the trial court abused its discretion. *Kindernay v. Hillsboro Area Hospital*, 366 Ill. App. 3d 559, 572, 851 N.E.2d 866, 877 (2006).

In the present case, Memorial argues that the plaintiffs received a double recovery because they recovered damages for Brandon's reduced life expectancy without any reduction in the damages awarded for his future caretaking and medical costs and because Brandon recovered damages for future medical and caretaking costs while his parents also recovered their costs for past and future special parental help in addition to the actual costs they incurred. These arguments are without merit, and the trial court did not abuse its discretion in denying the motion for a remittitur on these grounds.

Memorial also argues that a remittitur should be entered to reflect a setoff for the parents' contributory negligence. We agree. However, based on the jury instructions given in the present case, the jury awarded Brandon $2.6 million in damages for future caretaking and medical expenses but did not apportion the damages between those he will incur before

36

he attains majority (which were originally his parents' damages and must be reduced by 30% for their contributory negligence) and those he will incur after he attains majority (which were his own damages and should not be reduced for his parents' contributory negligence). Based on the record before us, we cannot determine the proper apportionment of those damages. Accordingly, we must remand the cause to the trial court for further proceedings.

## CONCLUSION

For the foregoing reasons, that portion of the judgment of the circuit court of St. Clair County awarding Brandon $2.6 million in damages for future caretaking and medical expenses is vacated, the remainder of the judgment is affirmed, and the cause is remanded for further proceedings. On remand, the circuit court is directed to conduct a hearing to determine the proper apportionment of the $2.6 million in damages awarded for Brandon's future caretaking and medical expenses between those he will incur before he attains majority and those he will incur after he attains majority and to order a remittitur to reduce those he will incur before he attains majority by 30% for his parents' contributory negligence. If the plaintiffs consent to the remittitur, the circuit court shall enter a judgment in favor of Brandon and against Memorial in the reduced amount. If the plaintiffs do not consent to the remittitur within a reasonable time period as set by the circuit court, the court shall order a new trial on the sole issue of damages for Brandon's future caretaking and medical expenses and shall instruct the jury to apportion those damages between those Brandon will incur before he attains majority and those he will incur after he attains majority.

Affirmed in part and vacated in part; cause remanded with directions.

CHAPMAN and DONOVAN, JJ., concur.

37

NO. 5-06-0291

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | |
|---|---|
| BRANDON BAUER, an Infant, by Scott Bauer, His Father and Next Friend, and SCOTT BAUER and AMY BAUER, Individually, | ) Appeal from the<br>) Circuit Court of<br>) St. Clair County.<br>) |
| Plaintiffs-Appellees, | )<br>)<br>) |
| v. | ) No. 00-L-373<br>) |
| MEMORIAL HOSPITAL, | ) Honorable<br>) James M. Radcliffe III, |
| Defendant-Appellant. | ) Judge, presiding. |

**Opinion Filed**:  November 27, 2007

**Justices**:  Honorable Bruce D. Stewart, J.

Honorable Melissa A. Chapman, J., and
Honorable James K. Donovan, J.,
Concur

**Attorneys for Appellant**  Michael A. Pollard, Lindsay A. Philiben, Baker & McKenzie, LLP, One Prudential Plaza, 130 East Randolph Drive, Chicago, IL 60601; Edward S. Bott, Robert L. Duckels, Greensfelder, Hemker & Gale, P.C., 2000 Equitable Building, 10 South Broadway, St. Louis, MO 63102-1774

**Attorney for Appellees**  Rex Carr, The Rex Carr Law Firm, LLC, 412 Missouri Avenue, East St. Louis, IL 62201